

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-29-2009

# Hummel v. Rosemeyer

Precedential or Non-Precedential: Precedential

Docket No. 06-2711

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Hummel v. Rosemeyer" (2009). *2009 Decisions.* Paper 1420.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1420

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-2711
_____


EDWARD V. HUMMEL,
                                    Appellant
                    v.

FREDERICK ROSEMEYER, Superintendent;
Esquire *TOM CORBETT ATTORNEY GENERAL
OF THE COMMONWEALTH OF PENNSYLVANIA

*{Substituted pursuant to F.R.A.P. 43(c)}


_____


On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 02-cv-00313J)
District Judge: Honorable Kim R. Gibson

____

Argued October 30, 2008

Before:  SLOVITER, STAPLETON and TASHIMA[*],
Circuit Judges

(Filed April 29, 2009)
_____

_____

[*]  Honorable A. Wallace Tashima, Senior Judge of the
United States Court of Appeals for the Ninth Circuit, sitting by
designation.

H. David Rothman (Argued)
Pittsburgh, PA l5232

      Attorney for Appellant

Leanne R. Nedza (Argued)
William A. Shaw, Jr.
Office of District Attorney
Clearfield, PA l6830

      Attorneys for Appellees

_____

OPINION OF THE COURT
_____

SLOVITER, <u>Circuit Judge</u>.

We are once again faced with the need to determine whether the state court determination that counsel representing a petitioner in a state court criminal action provided competent counsel as required by the Sixth Amendment survives our review under 28 U.S.C. § 2254.

Edward Hummel, who is missing a portion of his brain after a self-inflicted gunshot wound, sought a writ of habeas corpus, contending that his trial counsel failed to perform up to the constitutional standard when he (1) stipulated that Hummel was competent to stand trial and (2) did not seek to have Hummel evaluated by a psychiatrist before trial. The District Court denied Hummel's request for a writ of habeas corpus. We will reverse.

**I.**

**Background**

A.    <u>The Murder</u>

2

Hummel was married to Debra Hummel, and the couple had two teenage daughters. Unknown to Hummel, Debra was having an affair with Walter Maines. Maines' wife telephoned Hummel about the affair on November 22, 1991, and Hummel responded that he had learned of the affair that morning. When Debra came home that night she confirmed the affair. Some aspect of Debra's sexual activity and Hummel's reaction was provided by Hummel's mother, who testified at the PCRA hearing that Hummel asked her if she knew "that Debbie told me that she had performed oral sex on men, and then came home and kissed me 15 minutes later?" R. at 370a.[1] Shortly after Debra admitted her actions to Hummel, he hit her in the face several times and then shot her in the head, killing her. Hummel then went to his parents' house and told them what he had done. Thereafter, he left a suicide note for his daughters, and returned to his house where he shot himself in the head with the same gun. Hummel survived, but was rendered a paraplegic and suffered brain damage from the shot.

## B.    Pre-trial Events

Immediately after the shooting, Hummel was hospitalized from November 22, 1991, to December 30, 1991, was then transferred to a rehabilitation center until February 25, 1992, then again hospitalized in a psychiatric unit for suicidal ideation until March 4, 1992, was again briefly hospitalized until March 9, 1992, and thereafter received outpatient care while he was out on bail living with his parents. When it became clear that he

---

[1]After oral argument, we obtained a copy of the record before the Western District of Pennsylvania on Hummel's habeas claim, which we cite in this opinion as "R. at ___." We also note that Volume II of the Appendix, as well as the record, are not numbered sequentially. Reference to the appropriate appendix or record page is confused because the pages in one of the appendices, Volume II, are variously numbered, for example, 24a, 24aa, and 24aaa. Finally, only portions of transcripts have been included, and although they often fail to identify the speaker, we have made the identification from the context.

would not die from the self-inflicted wound, he was charged by the Commonwealth of Pennsylvania with his wife's murder (among other related crimes). F. Cortez Bell, a public defender for Clearfield County, was appointed as Hummel's counsel, and represented him at the bail hearing in March 1992. Hummel's parents, but not Hummel, were present. The court granted bail and Hummel returned to his parents' home.

Bell obtained several continuances of the preliminary hearing so that Hummel could be examined to determine whether he was competent to stand trial. During these continuances, Hummel was examined by two psychologists: Allan M. Tepper, J.D., Psy.D, and Vincent F. Berger, Ph.D. In his report, Dr. Tepper, who was retained by the District Attorney, stated that he "is unable to state, within a reasonable degree of psychological certainty, whether or not Mr. Hummel currently is capable of proceeding to trial." R. at 17. Dr. Berger, retained on behalf of the Public Defender, found that Hummel was "marginally competent" to stand trial provided modifications were made to ensure that Hummel was able to understand what was going on and to accommodate his short attention span. R. at 20. Their reports were filed with the court. Bell did not seek an additional evaluation either then or thereafter.

Bell did file a motion on August 7, 1992, requesting a competency hearing but a few days later, on August 10, 1992, Bell and the attorney for the Commonwealth reached an agreement that Hummel was competent to stand trial. Bell did not consult with Hummel's parents, who were Hummel's court appointed guardians, about this stipulation.

It is significant that at the time Bell made this agreement he still had not yet met with Hummel because, he states, Hummel's parents -- who insisted their son was "incompetent and unable to communicate" -- did not allow Bell contact with Hummel. In fact, Bell, who was appointed in March 1992, met with Hummel for the first time on the day of Hummel's preliminary hearing, August 12, 1992, shortly before the hearing began. This was despite the fact that Hummel had been living at

4

his parents' house since his release following the bail hearing on March 6, 1992. Bell, in fact, did not speak to Hummel again until jury selection began in January 1993, saying later that he had taken Hummel's parents at their word that their son remained incompetent. Of particular relevance is the fact that Bell did not bring Hummel's parents' doubts as to Hummel's competency to the attention of Judge John Reilly, the trial judge.

### C. The Trial

Although Hummel's provocation defense would likely have been strengthened by his testimony as to his wife's admission of sexual conduct with other men,[2] Bell convinced Hummel and his father that Hummel should not testify during the trial. Bell told them that anything Hummel said while on the stand would undermine "any claims of incompetency tha[t] anyone wished to raise at any point whether during the course of trial or on appeal or whatever." App. at 32a. Thus, the trial proceeded without Bell having discussed with Hummel his recollection of the shooting, his reasons for the shooting, and his state of mind. Although Bell would later, at the PCRA hearing, express his concerns about Hummel's ability to focus on the trial proceeding, Bell did nothing to note this for the record at the time of the trial. When Bell noticed that during the trial Hummel "was down on the table, could not be roused, could not be awoken," App. at 45a, he approached the bench and, without explanation to the court, requested a recess, which the court granted. During the prosecution's closing, Hummel suddenly woke up and shouted "[t]ell them about the blow jobs." App. at 37a. Hummel's statement is not recorded in the trial transcript, but Bell's testimony regarding the outburst is not challenged. At this point, Bell covered Hummel's mouth and Hummel's father removed Hummel from the courtroom. The prosecutor's closing statement continued with Hummel absent from the room.

---

[2] Under Pennsylvania law, voluntary manslaughter covers a defendant acting "under a sudden and intense passion resulting from serious provocation." 18 Pa. Stat. Ann. § 2503.

The trial court asked Bell whether he would like Hummel back in the room for the jury instructions, but Hummel was not brought back into the room because Bell was unable to wake him. Bell did not tell the judge that Hummel was asleep, nor did he seek an opportunity to question Hummel about the outburst, which referred to his wife's admission of recent oral sex with others. Bell never questioned Hummel about the murder, even after Hummel's outburst.

The trial continued and Hummel was found guilty by the jury of first degree murder and assault. Bell then filed what he characterized as a motion for a new trial. This motion was based on events occurring during the trial that Bell said he believed raised questions about Hummel's competency. The court asked whether Bell had any additional medical evidence regarding competency, and he responded that he did not. The following exchange then occurred:

> The Court: Did he cooperate with you during the course of trial and at recesses, and was he able to discuss it with you?
>
> Bell: I would characterize that as haltingly, Your Honor. At times he did discuss it with me. We discussed aspects of the case quite intelligently. At other times I could not get appropriate responses. He'd forget what he was saying in mid-sentence. You know, we couldn't have a conversation, I guess would be the way to say it.

App. at 64a-65a.

The court found Hummel could not be considered incompetent on that evidence alone and denied the motion for a new trial. Hummel was sentenced to life imprisonment for the murder and a term of 5-10 years for the assault prior to the murder.

D.      Post Trial Proceedings

6

Bell pursued a direct appeal, challenging the decision of the trial judge that Hummel was competent to stand trial. The Pennsylvania Superior Court affirmed Hummel's conviction and sentence.

One year later Hummel's parents hired a new attorney, H. David Rothman, who represents Hummel here. Rothman filed a petition under the Pennsylvania Post Conviction Relief Act ("PCRA"), and also hired a psychiatrist, Dr. Robert Wettstein, who was Board certified in psychiatry and forensic psychiatry. Dr. Wettstein reviewed the trial transcript, some of the rehabilitation records following Hummel's brain surgery (resulting from his self-inflicted wound), and interviewed Hummel in jail.

Hummel was not present at the PCRA hearing. Dr. William Ryan, a psychiatrist who had been following Hummel's condition while he was at SCI Somerset, advised the court by letter dated May 23, 1996, as follows:

> [Hummel] does continue to reflect elements of cognitive brain impairment . . . . This impairment is primarily centered around trouble with memory/recall. Mr. Hummel can not follow a conversation if more than one person is speaking simultaneously. He continues to be essentially bed fast and helpless in ambulation functions. He feeds himself quite easily. He displays a cordial manner and expresses himself adequately. He does not always comprehend what he hears. There are elements of both expressive and receptive aphasia. It has been noted also that Mr. Hummel frequently avoids taking medication, as nursing staff tends to find pills secreted about his bed area from time to time.
>
> From a mental status standpoint and with reasonable medical certainty, I believe Mr. Hummel would be essentially not competent to understand a court procedure nor to participate with defense counsel in his own behalf. This opinion is arrived at from observing

7

him on a daily basis in respect to his memory incapacity, limited attention span, misperception of conversation and difficulty in self expression. I do not have an opinion about the mental competence of this individual at the time of his trial in your court.

App. at 481a.

Hummel's attorney waived Hummel's appearance; his parents, who were the guardians appointed by the court, were present. Bell, Hummel's trial counsel, whose performance was and is at issue, appeared by subpoena as the court's witness.

Bell, who testified about his performance before, during, and after the trial, stated that in light of the injuries Hummel had suffered he and the Commonwealth both believed they needed to have Hummel independently examined to determine his competency. He was familiar with Pennsylvania's Mental Health Procedures Act, but filed a petition for a determination of Hummel's status, not a petition to find him incompetent. He knew that a psychiatrist, unlike a psychologist, was a medical doctor but he did not seek appointment of a psychiatrist for Hummel.

Bell testified that he had extensive correspondence from Hummel's parents who told him they believed Hummel was not only physically incompetent to do certain things but also mentally incompetent. The Hummels had given Bell a list of various psychiatrists, particularly forensic psychiatrists, that could be used. Nonetheless, after he and the District Attorney reviewed the reports of the psychologists, which he stated indicated that Hummel was competent subject to reservations in terms of monitoring the trial, they sat down with the trial judge and agreed to a stipulation, leading to the court order that Hummel was competent to stand trial. It is important to emphasize that Bell's stipulation was made before he ever met Hummel. Despite Bell's failure to ascertain the underlying facts from Hummel, he testified that his approach was to defend by trying to convince the jury that Hummel was either not guilty or guilty of no more than voluntary manslaughter because he had

8

sufficient legal provocation.

Bell's pretrial contact with Hummel was limited to the preliminary hearing. He stated, "On the day of the preliminary hearing before going into the courtroom was the first time he and I ever spoke." R. at 208a. Bell stated that during the preliminary hearing, Hummel continually whispered things in his ear while the witnesses were speaking. Bell did not speak with Hummel between August 12, 1992, the day of the preliminary hearing, and January 1993, when jury selection began. Hummel's parents, with whom Hummel was living, "led [Bell] to believe that [Hummel] was incompetent; that he was sliding backwards; that he was not recovering or had any hope of recovery." R. at 210a. Bell took them at their word and therefore did not go to see Hummel. Bell conceded that he did not advise the trial judge that Hummel's parents believed Hummel was not competent and that he had not spoken with Hummel between the brief encounter at the preliminary hearing and the trial.

Dr. Wettstein, the psychiatrist hired by Hummel's counsel, testified at the PCRA hearing that he concluded that Hummel had been incompetent at the time of trial. The testimony of Dr. Wettstein was challenged by the state because Dr. Wettstein had examined Hummel in August 1996, three years after the trial. Dr. Wettstein explained that he reached the conclusion that Hummel was incompetent at the time of his trial because at the time of his examination of Hummel, Hummel displayed a "limited attention span, reduced level of alertness, short-term memory problems, difficulty tracking or processing more than one conversation at a time, and psychomotor slowing." R. at 502a. Dr. Wettstein further testified that Hummel would not have been expected to have been any better during the trial than he was when examined; indeed, his condition would have been expected to improve over time. Therefore, he was able to conclude that Hummel was incompetent during the trial.

Judge Reilly, the state judge who had originally presided over Hummel's trial, also was the PCRA judge, and he denied

the PCRA petition.

### E.     The Decision of the Pennsylvania Superior Court

Hummel appealed the denial of his PCRA petition to the Pennsylvania Superior Court, which affirmed by a divided decision.  The two-judge majority concluded that under sections 7402(c) and (e) of the Pennsylvania statute governing competency hearings, the Mental Health Procedures Act, 50 Pa. Stat. Ann. § 7101 et seq., Bell had no obligation to push for a competency hearing.  The relevant portion of section 7402(c), which deals with requests by counsel for incompetency hearings, states:

> Application to the court for an order directing an incompetency examination *may be presented* by an attorney for the Commonwealth, a person charged with a crime, his counsel, or the warden or other official in charge of the institution or place in which he is detained.

50 Pa. Stat. Ann. § 7402(c) (emphasis added).

The Superior Court interpreted this provision to mean the decision to request a hearing lay within the discretion of counsel. It contrasted this provision with section 7402(e) which states, "[w]hen ordered by the court, an incompetency examination . . . shall be conducted by at least one psychiatrist . . . ."  50 Pa. Stat. Ann. § 7402(e).  The Superior Court majority found that section 7402(e) was indeed mandatory, but that it was only triggered after an evaluation had been ordered.  Based on these conclusions, the court held that Bell could not be considered ineffective for failing to have Hummel examined by a psychiatrist because the mandatory provisions of the statute had not been triggered by a court ordered evaluation.

The Court also found that Bell could not be considered ineffective for failing to request a competency hearing because the statute was explicitly permissive and he was therefore under no legal requirement to do so.  The Court then noted, in language similar to that presented in the Commonwealth's brief to us:

10

We also observe that Appellant has failed to demonstrate that counsel's actions caused him prejudice. Appellant failed to show that had counsel requested a competency examination under the Act, the trial court would have exercised its discretion and ordered the examination. Appellant also failed to show the examination would have established Appellant was incompetent to stand trial. Appellant in addition failed to show that this evidence, together with any other evidence offered by Appellant, would have been clear and convincing on the issue of competence [the standard a defendant was required to prove at the time of Hummel's trial to show incompetence]. Thus, Appellant fails to demonstrate that counsel was ineffective with respect to the issue of competency to stand trial.

*Commonwealth v. Hummel*, No. 1169 WDA 1999, maj. slip op. at 17-18 (Pa. Super. Ct. Sept. 28, 2001).

Judge Brosky, the dissenting judge, stated that, under the circumstances of this case, Bell was required to ask for a hearing, and that the use of "may" in the statute merely indicated groups of individuals who were authorized to petition the court for a hearing. Judge Brosky opined that Hummel met his burden to show that this action prejudiced him by a preponderance of the evidence (the standard in Pennsylvania to prove prejudice). He also suggested that Bell's inexperience may have been a factor, noting that although Bell had ten years experience as a public defender, this was his first experience with a client who had a competency issue.

The Pennsylvania Supreme Court thereafter denied Hummel's appeal. Having thus exhausted his options in the state court, Hummel filed a federal habeas petition in the United States District Court for the Western District of Pennsylvania.

F.     The Federal Habeas Petition

The District Court referred the habeas petition to a Magistrate Judge who concluded that under the Antiterrorism

11

and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, he was required to respect the factual finding of the state court that Hummel had been competent at the time of trial. He recommended that the petition be denied; the District Court followed that recommendation. The District Court added that it would have reached the same conclusion even on de novo review.

A motions panel of this court issued the following certificate of appealability: "whether the District Court erred in denying on the merits appellant's claim that his trial counsel rendered ineffective assistance to appellant's prejudice by 'agreeing' at the August 10, 1992[,] conference that appellant was competent to stand trial and by declining either to request a psychiatric evaluation of appellant and a competency hearing under the provisions of the Pennsylvania Mental Health Procedures Act codified at 50 P.S. § 7402 or to otherwise revisit the issue of appellant's competence before trial."

## II.

### Jurisdiction and Standard of Review

The District Court had jurisdiction under AEDPA.[3] We review the decision of the District Court de novo. *Fahy v. Horn*, 516 F.3d 169, 179 (3d Cir. 2008).

Because the state appellate court determined Hummel's previous claim of ineffective assistance of counsel on the merits, we must review that decision under the highly deferential standard in AEDPA, which

> prohibits a federal court from granting an application for a writ of habeas corpus with respect to a claim adjudicated on the merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

---

[3] It is conceded that Hummel exhausted his state remedies.

12

established Federal law, as determined by the Supreme Court of the United States."

*Williams v. Taylor*, 529 U.S. 362, 399 (2000) (O'Connor, J., concurring) (quoting 28 U.S.C. § 2254(d)(1)). Also, under AEDPA "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III.

## Discussion

## A.

Before we analyze the particulars of Bell's representation, it is necessary to emphasize the significance of the Sixth Amendment right to counsel. As the Supreme Court stated in *Strickland v. Washington*, 466 U.S. 668, 685 (1984), "[t]he Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." As the Supreme Court thereafter stated in the companion case decided by it on the same day as *Strickland*;

> An accused's right to be represented by counsel is a fundamental component of our criminal justice system. Lawyers in criminal cases "are necessities, not luxuries." Their presence is essential because they are the means through which the other rights of the person on trial are secured. Without counsel, the right to a trial itself would be "of little avail," as this Court has recognized repeatedly. "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have."

*United States v. Cronic*, 466 U.S. 648, 653-54 (1984) (citations and footnotes omitted). Thus the inquiry required under the

13

Sixth Amendment is whether petitioner has demonstrated that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

An attorney's conduct is judged based on whether it is reasonably effective. *Strickland*, 466 U.S. at 687. This reasonableness, in turn, is measured based on the "prevailing professional norms." *Id.* at 688. The American Bar Association standards are guides, but only guides, to what is reasonable. *Id.* More recently, in *Rompilla v. Beard*, 545 U.S. 374 (2005), a habeas case, like this one, that challenged the Pennsylvania courts' rejection of the petitioner's ineffective assistance of counsel claim, the Supreme Court stated that "the American Bar Association Standards for Criminal Justice in circulation at the time of [defendant's] trial describes the obligation in terms no one could misunderstand in the circumstances of a case like this one." *Id.* at 387. The Court continued, "'[W]e long have referred [to these ABA Standards] as "guides to determining what is reasonable."' *Wiggins v. Smith,* 539 U.S. [510,] 524 [(2003)] (quoting *Strickland v. Washington,* 466 U.S., at 688), and the Commonwealth has come up with no reason to think the quoted standard impertinent here." 545 U.S. at 387 (footnote omitted).

Of course, the reasonableness of counsel's conduct must be judged based on the facts of the particular case at the time the questioned conduct occurred. *Strickland, 466 U.S.* at 690. As the *Strickland* Court explained;

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

14

*Id.* at 690-91.

The certificate of appealability granted in this case requires that we focus on two aspects of Bell's performance that Hummel challenges: Bell's agreement that Hummel was competent to stand trial on August 10, 1992, and Bell's failure to request that the court order an evaluation of Hummel's competency by a psychiatrist. The issues are interrelated. If it was unreasonable for Bell to have stipulated that Hummel was competent, it would necessarily have been unreasonable for Bell not to have pressed for a psychiatric examination and a competency hearing.

**B.**

At the time at issue, the ABA Standards for Criminal Justice stated, "[a]s soon as practicable the lawyer should seek to determine all relevant facts *known to the accused*." ABA Standards for Criminal Justice, Standard 4-3.2(a) (emphasis added), *reprinted in* Stephen Gillers & Roy D. Simon, Jr., Regulation of Lawyers: Statutes and Standards, at 343 (1991). The relevant mental health standard read, "[d]efense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence." ABA Criminal Justice Mental Health Standards, Standard 7-4.2(c) (1989). As the Supreme Court has noted, when reviewing a decision such as this, we are to look at whether the background investigation that led to Bell's decision to stipulate to Hummel's competency was reasonable. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003).

At the time that Bell agreed with the Commonwealth that Hummel was competent to stand trial, Bell relied on the reports from the two psychologists. Dr. Tepper, the Commonwealth's psychologist, reported that Hummel had an I.Q. score of 65, which placed him in the mentally retarded range of intelligence, that he did not remember whether he had been arrested for shooting his wife, that he did not know who his lawyer was, that he did not know the function of the judge or the prosecutor or district attorney, and that he had seen a trial on television. Dr.

15

Tepper further stated that Hummel had "an extremely limited understanding of the criminal legal process," "a rudimentary knowledge of the arrest and courtroom procedure," and "did not know or understand the roles of the various courtroom personnel or how a trial was conducted." R. at 14a. Continuing, "[t]he past records and present evaluation indicate that as a result of his head trauma, Mr. Hummel possesses limited cognitive skills." R. at 14a. The Commonwealth's psychologist continued;

> A major component in Mr. Hummel's present capacity to proceed to trial is whether he can communicate with his attorney, and whether he can discuss the facts and circumstances surrounding his arrest. Such discussion and communication abilities turn, in part, upon his ability to remember past events.

> The past information and present testing data show that Mr. Hummel possesses deficits with short-term memory. That is, he is less able to recall events which occurred in the immediate past. His short-term memory is not entirely impaired, but he has exhibited difficulties in this area since the date of his shooting.

R. at 16a. He then concluded;

> Based upon the available information and data, this examiner is unable to state, within a reasonable degree of psychological certainty, whether or not Mr. Hummel currently is capable of proceeding to trial. He possesses a rudimentary knowledge of courtroom procedure, and does appear capable of assimilating new material if such material is presented in a concrete, simplified fashion. Mr. Hummel does exhibit short-term memory deficits, and thus it would be necessary to insure, on an ongoing basis, that Mr. Hummel was following and retaining what legally was happening around him. As a result of his physical problems, Mr. Hummel is unable to sit for prolonged periods of time, and thus any courtroom proceedings would need to take into account these physical and fatigue limitations.

16

The main question in the mind of this examiner, very simply, is how much or how little information Mr. Hummel recalls regarding the facts and circumstances surrounding the death of his wife, and how able or unable he is to communicate this information to his attorney. The available record information, as compared to the results of the present evaluation, suggests that in the past Mr. Hummel has exhibited a greater understanding of the facts and circumstances surrounding the death of his wife. He currently is able to recall certain past events, dates, occurrences, and information. However, he stated to this examiner that he had no real understanding or knowledge of the whereabouts of his wife or how he sustained his physical injuries. Thus, in light of these factors, it is difficult to state within a reasonable degree of psychological certainty whether or nor Mr. Hummel remembers the facts and circumstances surrounding the death of his wife.

R. at 17a.

The report of Dr. Berger, the defense's psychologist, was not markedly different, although less detailed. His report stated:

In general, Mr. Hummel appears to be marginally competent to stand trial. The word marginally is used since there are two major areas of deficiency; both of these are in his ability to meaningfully assist his counsel in his defense. While Mr. Hummel is currently capable of thinking rationally in a planned and organized manner, this ability appears to wax and wane, as does his ability to attend to what is going on around him. His difficulties in these areas appear to be a result of the brain damage suffered as a result of the gun shot wound to his head.

The second questionable area of Mr. Hummel's ability to participate in his defense is related to his total lack of recall of the events just prior to the shooting of his wife as well as the events continuing through his self-inflicted injury.

17

. . . .

      . . . The difficulty regarding his ability to carry on rational thought processes and to attend to what is going on is a more serious matter. I believe that this issue could be addressed by some modifications in what is traditional courtroom procedure. In order for Mr. Hummel to follow the legal proceedings and to meaningfully participate with his attorney in his defense, I believe his attorney will have to frequently get Mr. Hummel's attention and draw him back to what is happening in the courtroom. It also may be necessary for counsel to frequently review with Ed what has just been said and/or what has just transpired.

      Additionally, due to Mr. Hummel's limited attention span, it may be necessary to have frequent court breaks and to make sure that witness testimony is provided in short doses. In this way, Mr. Hummel's attorney can continuously check with Mr. Hummel regarding what has recently been said. If testimony or proceedings were to go on for more than five to ten minutes at a time without drawing Mr. Hummel back into the proceedings, I believe his ability to follow the proceedings would be severely limited.

R. at 20a.

      We must ask whether either of these reports presented such an unqualified affirmation of Hummel's competency to stand trial so as to lead a reasonable attorney under these circumstances to stipulate that Hummel was competent. The answer is self-evident. Neither does. The reports from the psychologists were hardly ringing endorsements of Hummel's competency. There is little reason to believe that testimony from a psychiatrist would not have been enough to tip the scales, and it was unreasonable for Hummel's counsel not to pursue this further.

      In addition, we emphasize that Bell never met with Hummel in person before agreeing he was competent.

18

Hummel's parents, his guardians, repeatedly advised Bell of their belief that Hummel was incompetent and pressed him to seek a psychiatric consultation, even providing him with a list of potential psychiatrists.

Both psychologists hedged on the dispositive question whether Hummel could assist Bell. Both reported that Hummel had no recollection of the shooting incident, and without such information it is difficult to see how Bell could have presented a viable defense of provocation. Moreover, Bell never asked Hummel about his recollection of the shooting and the events that precipitated it. Bell did not challenge the decision of Hummel's parents that he could not meet with Hummel because Hummel was incompetent. This was patently contrary to Criminal Justice Standard 4-3.2(a), which requires that a lawyer meet with a client to learn the client's version of events. Nonetheless, Bell participated in a meeting with the District Attorney and the trial judge, and agreed that Hummel was competent to stand trial.

The Commonwealth responds that Bell did not stipulate to his client's competency and actually states that because it was Bell's petition that brought the issue before the court and he requested continuances that permitted mental evaluation, "it is absurd to think that he then stipulated to his client's competency." Appellee's Br. at 16. The order of the trial court belies the Commonwealth's position. The court's order on August 10, 1992 states:

> AND NOW, this 10th day of August, 1992, the Court having received and reviewed the reports of Dr. Allen M. Tepper and Vincent F. Berger, the Commonwealth's and Defendant's Experts who performed separate psyhcological [sic] evaluations, *and upon the agreement of the Commonwealth and the Office of the Public Defender representing the Defendant, it is the ORDER of this Court that the Defendant is found to be competent to stand trial.* Furthermore, the Court has been made aware of the physical and mental restrictions of the Defendant as set forth in the above described

reports, and will take the same into account during trial or any other legal proceedings, during which the Defendant's presence is required.

R. at 2a (emphasis added). We must accept the trial court's statement, incorporated in its order, that Bell agreed that Hummel was competent to stand trial.

At the PCRA hearing, Bell testified that he believed Hummel was competent but added: "[w]hether he was competent to testify in his own defense, I don't know." App. at 33a. When asked to expand on this response, Bell said that he believed Hummel understood what was going on in the courtroom, but that based on the reports from the psychologists he was not sure whether Hummel was able to remember what had occurred immediately before the shooting. Bell conceded that he did not ask Hummel what he remembered from that night and did not believe he was under any duty to do so. He never asked Hummel what he meant by his outburst about the "blow jobs." Bell also testified that during the trial he was forced to continually prod Hummel to keep him focused.

His description of the events at the trial makes manifest that a reasonable attorney would have had a sound basis to question his client's competency and to press for further evaluations. Bell's own testimony belies his conclusion that Hummel understood what was going on. Bell testified:

So during the course of trial, during the course of the preliminary hearing, during the course of jury selection, *I would describe verbally to Ed what was occurring in the courtroom*. In light of that, I felt that Ed was competent; that is, he was understanding what was going on, he was acknowledging and responding to the questions.

As to whether he was competent to testify at his trial, in light of what Dr. Berger had said that he could not recall the incidents of the actual shooting itself and directly thereafter, in light of the Commonwealth report

20

with regard to that, I didn't know whether Ed was competent; that is, whether Ed could describe what occurred at the residence or not.

App. at 34a (emphasis added). Again, Bell's interpretation of what he was required to do is clear from his own testimony:

> Q. Mr. Bell, don't you agree that as an effective trial attorney you had to interrogate your client about what occurred in that house immediately before the shooting?
>
> A. No, I don't think I had to.
>
> Q. You don't believe you had to?
>
> A. Nope; not in light of the information that I had.

App. at 34a-35a.

The combination of (1) Bell's stipulation to the competency of a defendant he had never met; (2) never meeting with Hummel between the preliminary hearing and jury selection, and failing to explain to Hummel's parents why such a meeting was necessary and press them to arrange it; (3) failing to advise the trial court of Hummel's parents/guardians' concerns about Hummel's competency; and (4) concluding Hummel was competent after reviewing what were, at best, ambivalent psychological reports on the defendant's competency, leads us to conclude that a reasonable attorney would not have stipulated to his client's competency without insisting on more information and further proceedings. Bell was ineffective for failing to do so.

The Commonwealth also argues that Hummel has not shown that the trial judge would have exercised his discretion and ordered further psychiatric testing or granted a competency hearing. Of course, we cannot hold with any reasonable certainty that the trial court would have held a competency hearing. But it was Bell's stipulation to Hummel's competency that removed from the trial judge the necessity of making any

21

such decision.  Given the ambivalence of the two psychologists, and the fact that Hummel had put a bullet through his brain, it is certainly probable that the trial court would have directed an intensive inquiry into Bell's mental stage had Bell advised the trial judge of Hummel's parents concerns and of Bell's failure to have any meaningful interaction with his own client.

## C.

Bell's failure to attempt to invoke the Pennsylvania procedures designed for the situation when a defendant's competency is questionable is a further basis for finding Bell was ineffective.  The Pennsylvania Mental Health Procedures Act provided that a request for "an incompetency examination may be presented by an attorney for the Commonwealth, a person charged with a crime, his counsel, or the warden or other official in charge of the institution or place in which he is detained."  50 Pa. Stat. Ann. § 7402(c).  There can be no question, therefore, that Bell could have filed an application for an examination of Hummel's competency.  The court had discretion to order such an examination ("[t]he court, either on application or on its own motion, may order an incompetency examination at any stage in the proceedings," *id.* § 7402(d)).  The statute further provides that such an examination "shall be conducted by at least one psychiatrist and may relate both to competency to proceed and to criminal responsibility for the crime charged."  *Id.* § 7402(e)(2).

On appeal from the denial of the PCRA, the Superior Court interpreted that provision to mean that it is within the discretion of the trial court to order an incompetency examination.  We defer to the Superior Court's construction of the Pennsylvania statute but the issue is whether Bell should have appealed to the discretion of the trial court to order such an examination.  It is precisely that point that was recognized in the dissenting opinion of Judge Brosky of the Superior Court, where he stated that under the circumstances Bell "should have at least requested the court to order that [Hummel] undergo a competenc[y] determination by a psychiatrist."  *Hummel*, No. 1169 WDA 1999, dis. slip op. at 7-8 (Brosky, J., concurring and

22

dissenting). He further stated, "I also believe that [Bell] should not have stipulated without actually requesting an examination, and a hearing." *Id.* at 8. We need not decide whether the trial court was required to direct a psychiatric examination. The issue before us is not the trial court's decisions but whether Bell's actions–or inactions–show his ineffectiveness. The focus on the ineffectiveness claim is that Bell never even asked that a psychiatrist be appointed. We see no persuasive explanation for his failing to have done so.

Would it have made a difference? Beyond the requirement that the defendant demonstrate an error by counsel, the defendant must also demonstrate that counsel's error had an effect on the judgment. *Strickland*, 466 U.S. at 691. That is, the defendant must prove prejudice, the second prong of the *Strickland* inquiry. *Id.* at 693. However, the Court in *Strickland* defined this very carefully. It is not necessary that the defendant show that the deficient conduct "more likely than not altered the outcome in the case." *Id.* Instead, the defendant must only demonstrate that "there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694 (emphasis added). In this case, Hummel must demonstrate that there is a reasonable probability he would have been found incompetent to stand trial.

To be found competent to stand trial, a defendant must "have sufficient ability at the pertinent time to consult with his lawyers with a reasonable degree of rational understanding, and have a rational as well as factual understanding of the proceedings against him." *Commonwealth v. Kennedy*, 305 A.2d 890, 892 (Pa. 1973) (citing *Dusky v. United States*, 362 U.S. 402 (1960)).

Dr. Wettstein, the psychiatrist appointed by Hummel's later counsel, examined Hummel and testified at the PCRA hearing about his conclusion that Hummel was incompetent at the time of his trial. He had reviewed the medical records and described the extent of Hummel's brain damage thus: "He had a penetrating gunshot wound to his brain which went through on one side of his head and exited on the other side of his head." R.

23

at 436a. The bullet entered the brain and "exited on the other side of the parietal lobe on the other side of the head with some damage below as well." R. at 438a. When asked what effect such a wound had in terms of a client communicating with his lawyer either in preparation for trial or in the actual trial, he stated that "we're dealing with short-term memory in the sense that the client needs to be able to remember what the attorney has said and use that memory in further discussions with his attorney. If he doesn't remember what's said ten minutes before, he's not going to be able to know what to say or how to deal with the attorney ten minutes later." R. at 439a. That also stands true for his ability to listen to witnesses and digest what witnesses were saying.

Dr. Wettstein further testified that Hummel "had severe . . . cognitive impairments, intellectual impairments of his attention and his memory and his concentration and the speed with which he would process information." R. at 443a. He also testified that the recommendations of the psychologists as to what should be done to keep Hummel aware of what was going on at the jury selection and the trial "were entirely unrealistic; that it was not a realistic recommendation to demand or require that an attorney or even the court frequently interrupt the proceedings to arouse the Defendant to keep him refreshed in terms of his memory and to keep him pumped up, so to speak, mentally throughout the duration of proceedings in a homicide trial such as this one." R. at 444a-45a.[4]

---

[4] Because Bell had stipulated to Hummel's competency without following up on Hummel's parents' urging to retain a psychiatrist, the opinion of Dr. Wettstein or a comparable psychiatrist was never offered by Bell either before or at Hummel's trial. In a recent opinion filed by this court we held that counsel's failure to conduct a full investigation of the murder scene demonstrated ineffective assistance of counsel. *Siehl v. Grace*, – F.3d – , No. 07-1568 (3d Cir. March 25, 2009). As we stated, when a strategic choice is made by counsel without the full investigation warranted by the facts and circumstances, it is unreasonable. Certainly, Bell's choices were at least as

The issue before us is not whether we must defer to the state court's determination that Hummel was competent but whether Bell was ineffective in his omissions and actions that led to the state court's determination that Hummel was competent and, if so, whether Hummel was prejudiced as a result. As our prior discussion demonstrates, Bell was so clearly ineffective that the state court's finding to the contrary is not entitled to deference because it was an unreasonable application of *Strickland*. *Williams*, 529 U.S. at 409-13. We also conclude, though for a different reason, that we are not bound to accept the state court's finding that Hummel was not prejudiced.

Under AEDPA a state court decision can be overturned when it is contrary to clearly established United States Supreme Court precedent.[5] When expanding upon what it meant to be contrary to a clearly established precedent, the Court used the following example in *Williams*:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a

unreasonable as those of Siehl's counsel.

[5]At the time of Hummel's trial, a defendant in a Pennsylvania state court was required to prove incompetence by clear and convincing evidence. *Commonwealth v. Banks*, 521 A.2d 1, 12 (Pa. 1987), *cert. denied* 484 U.S. 873 (1987), *denial of post-conviction relief aff'd* 656 A.2d 467 (Pa. 1995), *cert. denied* 516 U.S. 835 (1995). The Pennsylvania standard has since been changed to require a showing of incompetency by only a preponderance of the evidence, 50 P.S. § 7403(a), as required by the decision in *Cooper v. Oklahoma*, 517 U.S. 348, 369 (1996). Because of our disposition on other grounds, we need not consider the effect of *Cooper*. We note, however, that in a similar situation the Court of Appeals for the Tenth Circuit declined to defer to a state court competency determination made based on the clear and convincing standard of proof. *Walker v. Attorney General*, 167 F.3d 1339, 1345 (10th Cir. 1999).

rule that contradicts the governing law set forth in our cases. Take, for example, our decision in *Strickland v. Washington*, 466 U.S. 668 (1984). If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different." *Id.*[] at 694.

*Williams*, 529 U.S. at 405-06. This is *exactly* what happened in this case. The Superior Court of Pennsylvania said:

Appellant has failed to demonstrate that counsel's actions caused him prejudice. Appellant failed to show that had counsel requested a competency examination under the Act, the trial court would have exercised its discretion and ordered the examination. Appellant also *failed to show the examination would have established* Appellant was incompetent to stand trial. Appellant in addition failed to show that this evidence, together with any other evidence offered by Appellant, would have been clear and convincing on the issue of competence. Thus, Appellant fails to demonstrate that counsel was ineffective with respect to the issue of his competency to stand trial.

*Hummel*, No. 1169 WDA 1999, maj. slip op. at 17-18 (emphasis added).

In light of the Court's failure to use the Supreme Court's standard, i.e., "reasonable probability," and its use of the more stringent requirement of "show," the Superior Court's holding that Bell's actions did not prejudice Hummel is not entitled to deference because it was contrary to clearly established United States Supreme Court law. We conclude, for the reasons set forth above, (1) that Hummel's counsel was ineffective for

26

failing to deal appropriately with the likelihood that Hummel was incompetent to stand trial and (2) that there was a "reasonable probability" that Hummel was prejudiced by this ineffectiveness. *Williams*, 529 U.S. at 406. It follows that the District Court erred in denying Hummel's request for a writ of habeas corpus.

Because Hummel's conviction was tainted by his counsel's ineffectiveness, we will reverse the District Court's order denying habeas relief and remand with direction that the District Court issue an order remanding this matter to the Pennsylvania state court to vacate Hummel's conviction and, if the Commonwealth so requests, to determine whether Hummel is competent to be retried. The District Court's order shall provide that the petitioner may be retried within six months if he is deemed to be competent, and that, if petitioner is determined to be incompetent, the state court may proceed in accordance with Pennsylvania state law.