301 Ga. 859
FINAL COPY

S17A1104.  RICHARDSON-BETHEA v. THE STATE.

PETERSON, Justice.

Cornelius Richardson-Bethea appeals her convictions for malice murder and abuse of a disabled adult arising out of the death of Susan Walter, a woman with an intellectual disability who lived in Appellant's home.[1] Appellant argues that she is entitled to a new trial because her trial counsel was ineffective for failing to call an expert witness to refute aspects of the medical examiner's testimony. Assuming without deciding that counsel's performance was deficient, we conclude that Appellant has not shown that counsel's failure to call an expert

---

[1] A grand jury charged Appellant with malice murder and a variety of other crimes. A trial in February 2014 resulted in a mistrial when the jury could not reach a verdict. After a May 2014 retrial, a second jury found Appellant guilty on all counts. The trial court sentenced Appellant to life without parole on the malice murder count, five years' imprisonment on abuse of a disabled adult, and merged all of the other counts into the malice murder count. Appellant filed a motion for new trial via trial counsel on June 18, 2014. Appellate counsel amended the motion, adding a claim of ineffective assistance of counsel, on January 8, 2016. Following a hearing, the trial court denied the motion in an order filed December 23, 2016. Appellant filed a timely notice of appeal, and we heard oral argument on May 2, 2017.

witness was so prejudicial as to require a new trial.

The first trial resulted in a mistrial when the jury could not reach a verdict. The evidence at the May 2014 retrial showed as follows. Walter came to live with Appellant in September 2011, under an arrangement through Lutheran Services of Georgia. Walter had orthopedic problems in addition to her intellectual disability and had a history of falls even before she went to live with Appellant. Walter's primary care physician, Deanna Ross, testified that Walter used a walker and was so "wobbly" that on occasion she was unable even to stand on a scale to be weighed. Ross observed bruising consistent with a fall at several office visits. There also was evidence of prior seizures: Walter's brother testified that he had been told Walter had a seizure-like episode in 2000, although he had not witnessed it. Appellant also made contemporaneous reports of Walter having experienced a seizure in or around August 2012, and Walter confirmed for her Lutheran Services case manager, Jolita Rix, that the seizure had taken place.

When police and EMTs responded to Appellant's 911 call in the early morning hours of March 2, 2013, they found Walter dead and cold to the touch, with bruises on much of her body. Appellant reported to those who responded

2

that the prior afternoon she had found Walter on the floor, having suffered an apparent seizure, and that the bruising had come from Appellant picking up Walter at that time. Later that evening, Appellant said, she went to check on Walter and found that she had vomited while in bed. Appellant reported that she assisted Walter onto a chair or couch and changed her bed linens. Appellant said she checked on Walter at midnight and she was fine, but found her unconscious and not breathing when she checked on her again around 2:00 a.m.

In a subsequent interview,[2] Appellant denied ever hitting or otherwise losing her temper with Walter. Appellant attributed the bruises on Walter's face and chin to Walter falling on her face when she had the seizure and said bruising on Walter's abdomen resulted from a fall on a bar in the bathtub. Asked at the first trial when the bathtub incident occurred, Appellant initially testified that she didn't recall, then said it occurred "[m]aybe about a week" before Walter's death.[3] Appellant on March 1 had informed Walter's brother, and Rix, the

---

[2] A videotape of the interview was played for the jury.

[3] Appellant did not testify at the second trial, but portions of her testimony from the first trial were read for the second jury. In prompting an investigator to read portions of Appellant's testimony, the State referred to the first trial as "another hearing[.]" Appellant did not object to this reading of her testimony, and her counsel asked the investigator on cross-examination to read additional portions of Appellant's trial testimony.

3

Lutheran Services case manager, that Walter had a seizure that day, and Rix testified that she spoke to Walter on the telephone about 10 minutes after she reportedly had the seizure and that Walter seemed "cheerful." But Appellant made no contemporaneous report or documentation of the alleged bathtub fall, despite generally being diligent in documenting Walter's falls, near falls, and minor injuries. Gail Goodridge, a state contractor who also monitored Walter's care, testified that she visited Walter "a day or two" before her death and did not observe any injuries. And instructors at the day program that Walter attended also testified that they had not observed Walter having injuries of the sort she had at her death.[4]

Two of Walter's physicians testified that Walter's injuries were not consistent with a ground-level fall to the floor. And Kris Sperry, then the State's longtime chief medical examiner, testified that several of Walter's injuries could not have resulted from a fall. Sperry, who performed Walter's autopsy, described extensive bleeding on the undersurface of Walter's scalp and a massive bruise on her lower abdomen, saying the fat in that area had "liquefied

___

[4] Appellant told police that Walter had not been to the day program in the two days preceding her death, because Appellant had been ill.

4

because of the extensive blows that were sustained[.]" Sperry testified that the abdominal injury appeared to have been caused by "multiple blows" to the area, possibly 15 to 20 or more punches, kicks, or blows from an object, and that it could not have been caused by Walter falling onto the shower bar. Sperry testified that Walter died due to swelling of her brain, compounded by a subdural hemorrhage.[5] He said he thought her death was caused by repeated blows to the right side of her head by fists and/or feet. Sperry testified that most of the injuries Walter sustained, including the abdominal injury, occurred around the same time, that she most likely would have been unconscious (and thus unable to talk on the phone) by the time the last of the blows to the head were inflicted, and that the head injuries would have caused her death within 30 to 60 minutes.

For the defense case, Appellant's trial counsel called several witnesses — her pastor, the daughter of a former client, her niece, and her sister — to testify to her good character, honesty, and the positive relationship she had with Walter. Rix and Goodridge also testified to a generally positive relationship

---

[5] Sperry testified that a subdural hemorrhage is a blood clot on the surface of the brain beneath the thick membrane that covers the brain.

between Walter and Appellant and that Walter had reported satisfaction with living with Appellant.

Appellant was convicted of malice murder following the second trial. Appellant argued in her amended motion for new trial that she had been denied effective assistance of counsel because her trial counsel had failed to retain expert testimony to refute the medical testimony presented by the State. At the hearing on the motion for new trial, the defense presented the testimony of a forensic pathologist, Joseph Burton, who previously had served as the chief medical examiner for several Georgia counties. Burton testified that he agreed with Sperry that subdural hemorrhaging in conjunction with swelling of the brain was the cause of Walter's death. And at one point he testified that subgaleal bruising[6] showed that someone struck Walter on the head more than one time with some object. But Burton also testified that he did not think a punch or a kick to the top of the head could have caused the hemorrhaging.

Burton testified it is possible for someone to remain lucid for several days following an incident that causes subdural hemorrhaging and brain swelling, so

_____

[6] Burton explained that subgaleal bruising is bruising on the layer of the scalp closest to the skull bone.

6

it is possible that Walter had a telephone conversation after receiving an injury that caused those symptoms. Even so, he acknowledged that it was "a stretch" to conclude that Walter was conscious for even as long as ten or twelve hours following the injury. Burton disagreed with Sperry's conclusion that a fall onto the shower rail could not have caused Walter's abdominal injury. And, although Burton initially said that the abdominal injury likely occurred about the same time as the brain injury, he later said the abdominal injury happened several days before Walter's death. Burton testified that it was possible that Walter's death was not a homicide and she rather had a seizure the day before her death, hit her cheek which caused the subdural hemorrhaging, hit her head on the floor which caused the subgaleal bruising, remained conscious for several hours, and died that night.

But on cross-examination, Burton testified that he would not be willing to testify to a reasonable degree of medical certainty that she died in that fashion. He acknowledged having a bias against the GBI, saying he thought GBI pathologists testified "with a prosecutorial slant." He also acknowledged having erroneously stated in a report that Walter was an alcoholic. Questioned by the trial court about what he considered in reaching his conclusion as to the

7

cause and manner of death, Burton said that among other things he considered Appellant's testimony that she saw Walter fall out of a chair, then, in Burton's words, "kind of thrash around on the floor" for several minutes.

The State called Appellant's trial counsel at the motion for new trial hearing. After meeting with Sperry prior to the first trial, trial counsel testified, he concluded that he did not need a forensic expert in Appellant's case because (1) Sperry was very accomplished and the chief medical examiner for the State; (2) trial counsel had worked with Sperry previously as a criminal defense lawyer and found him unbiased and accommodating; and (3) Sperry was very knowledgeable about the case and unequivocal about his medical findings. In the light of Sperry's impartiality and credibility, trial counsel testified, he determined that he did not have a good faith basis to ask the court to pay for a defense forensic pathology expert. He also was concerned about the negative effect of the jury hearing a second round of testimony about Walter's injuries. The defense focus was on the theme that Appellant was not the type of person to have inflicted Walter's injuries, trial counsel said.

The trial court denied the motion for new trial, finding that the evidence was sufficient to support the guilty verdicts and that Appellant had failed to

8

prove that her counsel was ineffective. The trial court found that the defense strategy based on Walter's penchant for falling as the cause of her injuries, Appellant's good character, and the warm relationship between her and the victim was reasonable, as it was supported by ample evidence. Counsel was justified in not presenting an expert that would have kept the focus on Walter's injuries, the trial court ruled. The trial court also found that there was no reasonable probability that the outcome of the trial would have been different had Burton testified at trial, given that Burton agreed with much of Sperry's testimony and would not testify to a reasonable degree of medical certainty that Appellant's theory of Walter's death was correct. Moreover, the trial court pointed to problems with Burton's testimony, such as internal contradictions and his admitted bias against GBI pathologists like Sperry. The trial court noted that Burton had to retract a reference to the victim as an alcoholic, and the trial court said it had been unable to find any basis in the record for Burton's understanding that Appellant had said she saw Walter thrash about on the floor for several minutes.[7]

---

[7] In her trial testimony, read for the jury at the second trial, Appellant said she saw Walter "convulsing," whereupon Appellant "put the lever down on the chair and it kind of threw her out of the chair." Appellant testified that Walter's body convulsed during the

9

1. Although Appellant does not challenge the sufficiency of the evidence, we have independently reviewed the record and conclude that the trial evidence was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that she was guilty of the crimes for which she was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Appellant's sole contention on appeal is that she was denied effective assistance of counsel during the preparation of the case for trial and during the trial itself by trial counsel's failure to retain expert testimony to refute the medical testimony presented by the State. In order to establish that trial counsel was ineffective, Appellant must show both that trial counsel's performance was deficient, and that the deficient performance prejudiced her defense. Strickland v. Washington, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). In order to show prejudice, the defendant must show that a reasonable probability exists that, but for trial counsel's errors, the outcome of the trial would have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "We accept the trial court's

---

course of the seizure, which she said "didn't last a full minute."

10

factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." Robinson v. State, 277 Ga. 75, 76 (586 SE2d 313) (2003) (citation and punctuation omitted).

Assuming without deciding that trial counsel was deficient for failing to present expert medical testimony to the jury — or, at the very least, consult with a potential expert witness — we conclude that Appellant is not entitled to a new trial because she "cannot show a reasonable likelihood that, but for the failure to retain an independent expert, the outcome of [her] trial would have been more favorable." Id. at 77 (2). "In assessing the prejudicial effect of counsel's failure to call a witness (whether that failure resulted from a tactical decision, negligent oversight, or otherwise), a petitioner is required to make an affirmative showing that specifically demonstrates how counsel's failure would have affected the outcome of his case." Goodwin v. Cruz-Padillo, 265 Ga. 614, 615 (458 SE2d 623) (1995). In other words, Appellant cannot rely on what some hypothetical expert might say, but must show that there is a reasonable likelihood that the testimony of Burton would have changed the outcome of her trial. See id. (impossible for defendant to show he was prejudiced by trial counsel's failure to subpoena certain witnesses, given that appellant failed to make any proffer

11

of the uncalled witnesses' testimony); see also <u>Woods v. State</u>, 275 Ga. 844, 849-850 (3) (d) (573 SE2d 394) (2002) (defendant cannot show prejudice from counsel's failure to use videotape at trial, where defendant never introduced tape itself into evidence).  Appellant has failed to make this showing.

Although there were some aspects of Burton's testimony at the motion for new trial hearing that were favorable to Appellant, there were other aspects that were not.  Among other things, Burton testified that:

- Multiple blows to the belly with a fist could create a bruising pattern that looks similar to that on Walter's abdomen.

- Subdural hemorrhaging in conjunction with swelling of the brain was the cause of Walter's death.

- It's unlikely Walter fell on the top of her head; rather, kicks or punches to the head were a likely cause of her subgaleal bruises, and the physical evidence showed that someone struck Walter on the head more than one time with some object.

- He could not say to a reasonable degree of medical certainty that Walter died consistent with his theory that she had a seizure the day before her death, hit her cheek which caused the subdural

12

hemorrhaging, hit her head on the floor which caused the subgaleal bruising, remained conscious for several hours, and died that night. Even putting aside the trial court's stated questions about Burton's credibility, the above-cited testimony would have bolstered, rather than rebutted, the testimony of the State's expert. Burton's testimony that it was possible Walter died as a result of head injuries caused by a fall associated with a seizure and that her abdominal bruises were caused by a fall in the shower *might* conceivably have created some doubt in the mind of a juror. But that is not the standard; the standard is whether there is a *reasonable probability* that the result of the trial would have been different had trial counsel presented the proffered evidence. See Strickland, 466 U. S. at 694. Although there was evidence presented that Walter was unsteady and had a history of seizures, Burton acknowledged that it was likely that Walter had been kicked or punched in the head, and he would not commit to a medical certainty to his posited scenario that Walter died as a result of a fall associated with a seizure. Given the equivocal nature of Burton's testimony, the many ways in which Burton bolstered Sperry's damning testimony, and Burton's inability to address other aspects of the State's

13

case,[8] we cannot conclude that there is a reasonable probability that the result of the trial would have been different had trial counsel presented Burton's testimony. See Davis v. State, 290 Ga. 584, 586 (2) (a) (723 SE2d 431) (2012) (rejecting ineffective assistance of counsel claim based on failure to call defense expert to rebut medical examiner's testimony that victim had only defensive wounds, given that both the emergency room doctor who testified at trial and the expert who testified at the motion for new trial hearing were equivocal about the nature of a wound on the victim's hand); Robinson, 277 Ga. at 77 (2) (appellant could not show prejudice from counsel's failure to seek funds to retain an expert to refute medical examiner's testimony, given physical and eyewitness evidence that was consistent with medical examiner's position).[9] The trial court did not

---

[8] Burton could not refute the non-medical evidence that undermined Appellant's story that she had not physically abused Walter. Appellant said bruising on Walter's abdomen resulted from a fall on a bar in the bathtub about a week before her death. But Appellant did not document or report the alleged fall, despite her usual diligence in this regard.

[9] The federal cases Appellant cites do not convince us otherwise. In two cases cited by Appellant, experts at the post-conviction stage directly refuted the State's evidence, unlike the expert here, who equivocated and in some respects supported the State's case. See Showers v. Beard, 635 F3d 625, 634 (3d Cir. 2011) (expert testimony presented at hearing on defendant's petition for collateral relief "would have cast serious doubt" on prosecution's case by supporting defense suicide theory); Richey v. Bradshaw, 498 F3d 344, 363-364 (6th Cir. 2007) (experts presented at post-conviction petition stage would have testified that the fire the State accused the petitioner of setting most likely started accidentally). Another case cited by Appellant, Hummel v. Rosemeyer, 564 F3d 290 (3d Cir. 2009), presented an easy

err in rejecting Appellant's motion for new trial.

Judgment affirmed.  All the Justices concur.

Decided August 28, 2017.

Murder. Newton Superior Court. Before Judge Wynne.

Teresa L. Doepke, for appellant.

Layla H. Zon, District Attorney, Randal M. McGinley, Jillian R. Hall, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Scott O. Teague, Assistant Attorney General, for appellee.

---

question of prejudice as a result of trial counsel's stipulation to his client's competency despite experts for *both* sides having hedged on the question of the client's competency.  The Third Circuit found that the petitioner was entitled to habeas relief, noting that the expert the petitioner presented at the post-conviction stage testified that the petitioner was incompetent at the time of his trial.  Id. at 303-305.

15