NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 13, 2024

S24A0642. BOWMAN v. THE STATE.

MCMILLIAN, Justice.

Appellant Roe Dale Bowman was convicted of malice murder and other crimes in connection with the death of Tammy Wolfe.[1] On appeal, he argues that trial counsel was constitutionally ineffective on numerous grounds and that the trial court abused its discretion in admitting evidence of Bowman's prior acts of violence involving

---

[1] The crimes occurred on April 4, 2017. On March 19, 2018, Bowman was indicted for malice murder; felony murder; two counts of aggravated assault; and possession of a firearm during commission of a felony, in connection with Wolfe's death. At a trial in March 2020, the jury found Bowman guilty of all counts. On March 31, 2020, the trial court sentenced him to serve life in prison without the possibility of parole for malice murder (Count 1), and five years in prison consecutive to Count 1 for the possession offense (Count 5). The felony murder count (Count 2) was vacated by operation of law, and the aggravated assault counts (Counts 3 and 4) merged into the malice murder count for sentencing purposes. On April 30, 2020, Bowman filed a motion for new trial through new counsel. He amended that motion on March 31, 2021. The trial court held a hearing on the amended motion from August 11 to August 12, 2022, and denied the motion in an order dated September 28, 2023. On October 30, 2023, Bowman timely filed a notice of appeal. This case was docketed to the term of Court beginning in April 2024 and submitted for a decision on the briefs.

his ex-wife. For the reasons that follow, his claims fail, so we affirm.

1. The evidence at trial showed the following. For a few years before her death, Wolfe and Bowman had been in a romantic relationship, throughout which they would ride motorcycles and take trips together. At one point, the two got engaged, but their relationship was tumultuous. Multiple witnesses testified about instances where Bowman treated Wolfe in jealous, violent, or controlling ways. One of Wolfe's brothers testified to an instance where Bowman argued with Wolfe for not holding his hand on a street in Florida. Another one of Wolfe's brothers recounted that once after a friend hugged Wolfe from behind, Bowman grabbed Wolfe's arm "really, really hard" and said "I can't believe you turned your back on me like that." An acquaintance of Wolfe's mom observed Bowman "take [Wolfe] by the arm and pull her towards the door" when she wanted to stay at a flea market against Bowman's wishes and "slap" Wolfe "if she looked at somebody else for anything." The same acquaintance testified that Bowman "wouldn't think twice about balling his fist up and hitting [Wolfe] right in the

eye," and that Wolfe had "[b]lack eyes, busted lips" and bruises on her arms and wrist, which gave the acquaintance further concern about Bowman and Wolfe's relationship. One of Wolfe's work colleagues testified that Wolfe had confided in her that Bowman would follow Wolfe; that once in Florida, Bowman had pushed Wolfe down on a bed and choked her; and that Wolfe was afraid to end her relationship with Bowman because he had told her that "he could do something to her and get rid of her and . . . nobody would ever prove anything[.]"

Eventually, Wolfe broke off the engagement and started dating another man. Wolfe and Bowman continued to communicate, however, texting and calling each other in the days leading up to Wolfe's death. According to Wolfe's son, Jesse Wolfe ("Jesse"), Bowman would stalk Wolfe after the engagement ended, including at a Walmart, at a convenience store, near Jesse's grandparents' house, and near where Wolfe checked the mail. Jesse recounted Wolfe telling him that even after she "changed her routine," Bowman would still be "waiting on her." At one point, Jesse testified,

he "confront[ed] Roe [Bowman] about stalking [his] mother," and told Bowman that "he needed to leave her alone and just be done with it."

On the morning of April 4, 2017, at 5:28 a.m., Wolfe's cell phone texted Bowman's cell phone, "Good morning." Bowman's phone did not reply.[2] Eleven seconds later, Wolfe texted "Good morning" to another cell phone ending in the digits 7925 ("-7925 phone"), which texted Wolfe's phone "Good morning" at 5:30 a.m. The -7925 phone then called Wolfe's phone at 5:30 a.m., and Wolfe's phone called the -7925 phone at 5:33 and 5:58 a.m. Cell tower data showed that at 5:33 and 5:58 a.m., Wolfe's phone and the -7925 phone used the same cell phone towers and sectors[3] angling towards a cemetery where Wolfe was later found dead. As cell tower data suggested, Wolfe's

---

[2] It appeared that Bowman's cell phone never responded to Wolfe's "Good morning" text. Also, although Wolfe sent "Good morning" to Bowman's cell phone at 5:28 a.m., his phone did not receive the text until 6:39 a.m. A law enforcement officer testified that this meant that between 5:28 a.m. and 6:39 a.m., Bowman's cell phone might have been turned off, on "airplane mode," out of battery, or in an area "not covered by cell phone service."

[3] Detective Scott Demeester testified that a cell phone tower covers a 360-degree radius, of which a "sector" covers a 120-degree radius showing the direction a cell phone is relative to the tower.

phone arrived at the cemetery at about 6:05 a.m. Between 6:07 and 6:08 a.m., Wolfe's phone began moving away from the cemetery, traveling east and then south, the same direction as Bowman's residence. At 6:13 a.m., the last time at which law enforcement documented data activity from Wolfe's phone, her phone disconnected from the cell tower network. Cell tower data indicated that right before disconnecting, Wolfe's phone was close to a body of water and a wooded area. Neither Wolfe's phone nor the -7925 phone were ever recovered by law enforcement. "The last location we had of both cell phones pinging . . . [was] beside the pond," one law enforcement officer testified, and the last communication documented for both phones was the 5:58 a.m. call.

According to Detective Scott Demeester, an expert in cell phone forensics, the -7925 phone was a prepaid phone that lacked subscriber information and started service on March 9, 2017, about a month before the murder; was "not used very often" and "primarily communicated with the decedent"; and made or received only 11 calls from March 28 to April 7, 2017, communicating with Wolfe's

phone for eight of those calls. And, Detective Demeester testified, in the weeks leading up to Wolfe's murder, the cell tower most frequently used by both the -7925 phone and by Bowman's phone was the same.

Later on the morning of April 4, family and friends started to wonder where Wolfe was. Her son Jesse called Bowman at 9:49 a.m. to ask him if he had seen Wolfe, to which Bowman replied he had not. In the following hours, Bowman's cell phone began contacting Wolfe's phone several times, starting from 10:01 a.m.

At about 1:00 p.m., the cemetery's general manager discovered Wolfe's dead body covered in blood in the driver's seat of her car with the driver's side window down. An autopsy later revealed that she had gunshot wounds to her head and neck and stab wounds in her neck and chest. On the windshield were the letters "R" and "O"—the first two letters of Bowman's first name, "Roe"—written in blood. Law enforcement did not find a murder weapon but found Wolfe's purse inside the car, as well as shell casings and .22-caliber bullets on the ground next to the driver's side window. Male non-blood DNA

("contact DNA") found on Wolfe's purse did not match the DNA of Bowman or an officer at the scene, and DNA tests conducted on blood droplets found on and near the car were inconclusive.

After visiting the crime scene, law enforcement also began interviewing members of Wolfe's family. Through that investigation, law enforcement discovered Wolfe's cell phone number and obtained records from the provider, which led to the discovery of Wolfe's contacts with the -7925 phone on the day of her murder. Wolfe's son Jesse was able to log into Wolfe's Google account and sync her contact list to his phone. Entering digits from the -7925 phone number into Jesse's phone, an investigator found that the -7925 number had been saved in Wolfe's contacts as Bowman's first name ("Roe") and "FS Phone"—"Roe FS Phone."[4]

Officers interviewed Bowman, once on April 6 and once on

---

[4] Seeking to discredit this evidence, Bowman points to Jesse's testimony on cross-examination that when he logged into his mother's Google account a few months after April 4, 2017, "the contacts had disappeared. I mean . . . I don't know where they went." But this point is of no avail; law enforcement saved a screenshot of the -7925 phone number matching with "Roe FS Phone," and the screenshot was admitted as evidence.

April 7, 2017. In Bowman's first interview, officers talked to Bowman about his relationship with Wolfe and asked him about his phone; he stated that he broke off the engagement and that he had one phone, which he then handed to the officers. In his second interview, officers asked Bowman to speak further about his relationship with Wolfe and asked him if he had a second phone. He stated that he and Wolfe ended their relationship because "she didn't want to be friends with benefits anymore." And, he stated that he had a "food stamp" phone, which made, as an officer testified at trial, "the letters FS [become] pretty significant[.]" Bowman later gave law enforcement a phone that he claimed was the "food stamp" phone. Officers did not find information on that phone linking Bowman to the murder, and the number for that phone was not the same as the one saved in Wolfe's contacts as "Roe FS Phone." At one point, Bowman also told police that he did not "carry any weapons" due to a medical condition, but that he did have a knife, which police found in his truck. After the grand jury indictment, when law enforcement officials arrested Bowman and executed a search

warrant on his residence, they found Bowman carrying a firearm on his side and a sheath knife on a lanyard around his neck, and found another sheath knife in his house.

2. Bowman claims his trial counsel provided constitutionally ineffective assistance on five grounds. To prevail on an ineffective assistance claim, Bowman must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficiency, Bowman must show that counsel "performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms[.]" *Scott v. State*, 317 Ga. 218, 221 (2) (892 SE2d 744) (2023) (citation and punctuation omitted). To prove prejudice, Bowman "must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Moulder v. State*, 317 Ga. 43, 47 (3) (891 SE2d 903) (2023). If Bowman "fails to make a sufficient showing on one part of the *Strickland* test, we need not address the

other part." *Copeland v. State*, 316 Ga. 452, 457 (3) (888 SE2d 517) (2023). And, "[i]n reviewing a trial court's ruling on an ineffective-assistance claim, we accept the trial court's factual findings and credibility determinations unless they are clearly erroneous, but we independently apply the relevant legal principles to the facts." Id. With this framework in mind, we assess each of Bowman's ineffective-assistance arguments.

(a) Bowman first claims that counsel was ineffective for failing to file a timely alibi notice, and in so doing, prevented counsel from calling Bowman's brother Ralph as an alibi witness, which counsel unsuccessfully attempted to do on the morning of trial. At the motion-for-new-trial hearing, Ralph testified that he heard Bowman "get[ ] up and walk[ ] through the living room" at around 7:00 a.m. the morning of the murder. On appeal, Bowman argues that had Ralph been called as an alibi witness, he could have testified that Bowman was at the house around 7:00 a.m. and that had he left the house earlier that morning, Ralph would have heard Bowman's feet "drop" against the floor due to a condition that caused Bowman to

lose strength in his legs. According to Bowman, counsel failed to call Ralph to testify at trial, not because of trial strategy, but because counsel failed to interview Ralph earlier and to timely file an alibi notice.

"A decision as to which defense witnesses to call is a matter of counsel's trial strategy and tactics and will not support a claim of ineffective assistance of counsel unless it is so unreasonable that no competent attorney would have made the decision under the circumstances." *Smith v. State*, 308 Ga. 81, 92 (4) (839 SE2d 630) (2020) (citation and punctuation omitted). Here, counsel testified at the motion-for-new-trial hearing that he "knew . . . there was no alibi" because he knew from speaking with Bowman that Bowman had left the house the morning of the murder and while Ralph was still asleep. And, counsel testified that he did not call Ralph to the stand because counsel feared that doing so would result in perjury:

> I didn't want to talk to Ralph after I talked to Roe [Bowman] and you know the reason. I didn't want to support perjury and I didn't want to talk to somebody if I've got to put them on the stand and make him testify without me asking did you do this or what time it was,

and . . . I think then and I think today it was best that I didn't put him on the stand.

And as for why counsel still ultimately sought to introduce Ralph as an alibi witness the morning of trial, counsel testified that he did so at Bowman's request.

Counsel's testimony amply shows that his initial choice to not call Ralph as an alibi witness was strategic since it was based on his investigation of the case and his assessment that Ralph lacked an alibi and might commit perjury, and thus was not "so unreasonable that no competent attorney would have made the decision under the circumstances." *Smith,* 308 Ga. at 92 (4) (citation and punctuation omitted). See *Andrews v. State*, 293 Ga. 701, 703 (2) (749 SE2d 734) (2013) (concluding that counsel made a "strategic decision" to not call alibi witness who might have lied about her activity with defendant on night of the murder); *Sims v. State*, 278 Ga. 587, 591 (3) (c) (604 SE2d 799) (2004) (concluding that counsel was not ineffective for failing to call witness to present testimony that counsel believed was perjured).

Moreover, Ralph's potential testimony, as indicated at the motion-for-new-trial hearing, was that Bowman was at the house at around 7:00 a.m. This would not conflict with the theory of Bowman killing Wolfe earlier between 6:05 and 6:07 a.m. Thus, counsel was not deficient for failing to call, as an alibi witness, a potentially perjurious witness who could not provide testimony supporting that it was impossible for Bowman to have committed the murder. See OCGA § 16-3-40 ("The defense of alibi involves the impossibility of the accused's presence at the scene of the offense at the time of its commission"); *McKelvey v. State*, 311 Ga. 34, 44 (5) (855 SE2d 598) (2021) (identifying no deficiency in counsel's failure to call two alibi witnesses whose testimony "would not have been helpful" and "may even have been harmful"); *Sims*, 278 Ga. at 591 (3) (c).

That counsel later sought to call Ralph as an alibi witness does not render counsel's failure to earlier provide an alibi notice deficient. As explained above, counsel had a strategic basis for his initial choice to not call Ralph as an alibi witness and thus not give timely alibi notice. That counsel later changed his mind upon his

client's request, after it was too late to do so, does not make his initial strategy any less reasonable. Accordingly, we conclude that counsel was not deficient in failing to timely file an alibi notice.

(b) Bowman also claims that counsel was ineffective for failing to investigate and present evidence that Bowman suffered from a degenerative disease, Charcot-Marie-Tooth (CMT) disease, that would have hindered him from committing the murder. At the motion-for-new-trial hearing, the defense offered testimony from one of Bowman's doctors that she had prescribed him pain medication and orthotics equipment for his CMT and that the disease could cause numbness, pain, and weakness; testimony from Bowman's sister that Bowman had modifications on his motorcycle accommodating his disabilities; and testimony from Ralph that Bowman wore leg braces and had trouble running. On cross-examination at the motion-for-new-trial hearing, the same doctor testified that her records showed that Bowman did not need help with transportation, shopping, preparing meals, housework, or laundry; Ralph's sister testified that Bowman regularly carried a

gun with him and indicated that he could operate a motorcycle for long trips; and Ralph testified that on the day of Wolfe's murder, he and Bowman went to a rock quarry, picked up a load of rocks, and later unloaded the rocks with shovels and rakes.

When explaining why he chose not to focus more on Bowman's CMT disease, counsel testified at the motion-for-new-trial hearing that he had investigated the disease by researching it and discussing it with Bowman and various witnesses, but concluded that a defense based on Bowman's CMT disease "would not be extremely helpful" and seeking further medical records "would not be in the best interest." Counsel explained: he "wanted [the jury] to know that [Bowman] was weak in the hands and . . . that was about the extent of it because [counsel] was concerned about [Bowman] . . . driving and riding motorcycles with his hands and using the brakes and the clutches."

Bowman has failed to show that counsel's performance was deficient. As counsel's motion-for-new-trial testimony shows—and as the trial court found in its order denying the motion for new trial

the reason why counsel did not subpoena or introduce evidence of Bowman's CMT disease was strategic. Counsel assessed that the jury would not believe the theory that Bowman's CMT disease precluded him from stabbing and shooting Wolfe. The record supports counsel's assessment. Not only did the jury hear evidence that Bowman was physically able to ride his motorcycle for long distances, the jury also heard that at the time of Bowman's arrest, he was carrying a firearm on his side and a sheath knife on a lanyard around his neck, which supported the inference that Bowman was capable of using both weapons. Moreover, evidence was presented that Bowman had been physically violent towards Wolfe. And lastly, the witnesses who testified to Bowman's CMT disease at the motion-for-new-trial hearing indicated that Bowman could perform a host of activities requiring physical strength, including shopping, meal preparation, laundry, and transporting rocks using shovels and rakes. Thus, even if the defense presented the theory that Bowman's CMT disease prevented him from murdering Wolfe and called the witnesses above to testify in support, that theory would not have

been credible, let alone persuasive, to the jury. Accordingly, counsel's failure to present such a defense was not deficient performance. See *Lanier v. State*, 310 Ga. 520, 525 (3) (a) (852 SE2d 509) (2020) (identifying no deficiency in counsel's failure to present defense theories that counsel did not find viable given the evidence); *Brooks v. State*, 309 Ga. 630, 637 (2) (847 SE2d 555) (2020) ("An attorney's decision about which defense to present is a question of trial strategy, and trial strategy, if reasonable, does not constitute ineffective assistance of counsel." (citation and punctuation omitted)).

(c) Next, Bowman claims that counsel was ineffective for failing to find and use at trial six photos that police took of Bowman showing him without injuries or scratches only a few days after the murder. We conclude that Bowman has failed to show deficiency. As this Court has stated before, "decisions as to what witnesses and other evidence to present are matters of trial strategy and are ineffective only if unreasonable ones that no competent attorney would make." *Horton v. State*, 310 Ga. 310, 328 (5) (a) (849 SE2d

382) (2020). Here, the State never argued that Bowman and Wolfe engaged in a physical struggle before Wolfe's death such that Bowman was likely to have been injured as a result, but instead, presented evidence that Bowman shot and stabbed Wolfe and drove away in a matter of minutes (from around 6:05 a.m. to 6:07 a.m.). Photos showing that Bowman lacked injuries shortly after the murder would have been unhelpful in rebutting the theory that Bowman ambushed Wolfe and thus would have carried little exculpatory weight, if any. Since the photos would have been of little or no avail to the defense, Bowman has failed to show that counsel was deficient for failing to find the photos and use them at trial. See *Morrison v. State*, 303 Ga. 120, 125-26 (5) (b) (810 SE2d 508) (2018) (no deficiency in counsel's failure to introduce medical-records evidence where counsel testified that the records "would not have had 'any significant bearing one way or the other on the trial'"); *McKelvey*, 311 Ga. at 44 (5) (no deficiency in counsel's failure to call two alibi witnesses, in part because their testimony "would not have been helpful").

(d) Bowman also claims that counsel was ineffective for failing to present testimony showing that two knives found after Bowman's arrest, and later admitted as evidence, were purchased after Wolfe was killed. Following Bowman's indictment in March 2018, police arrested Bowman and searched his residence, finding a sheath knife on a lanyard around Bowman's neck, and another sheath knife at his home. At trial, both knives were admitted as exhibits and became the subject of direct- and cross-examination. Sergeant Josh Smith testified for the State that the knives were "important" because Bowman had previously told police that "he did not carry any type of weapons with him, because of his medical disability." Another prosecution witness, a medical examiner who had examined Wolfe, testified that the two knives were "consistent with the way [Wolfe's stab] wounds look[ed]." In response, defense counsel pointed out on cross-examination that numerous other knives could have created Wolfe's stab wounds and that the medical examiner had neither tested the two knives for DNA nor seen them before trial. At closing argument, defense counsel pointed out the

lack of DNA evidence linking the two knives to Wolfe and argued that the knives had "nothing to do" with the case. The State, in turn, argued that at least one of the knives was "consistent with the knife that stabbed [Wolfe]," that Bowman "had plenty of time to clean [the knives]" after Wolfe's death, and that the knives showed that Bowman lied about not having weapons.

On appeal, Bowman argues that counsel should have presented testimony from Ralph or Bowman's girlfriend that the two knives were purchased *after* Wolfe's death. According to Bowman, by failing to present such testimony, counsel did not dispel the suggestion that Bowman killed Wolfe with those knives.

Assuming without deciding that counsel performed deficiently by failing to present such testimony, we conclude that Bowman has failed to show prejudice. Even if counsel had presented testimony showing that the two knives admitted at trial were purchased after the murder, that would not have undermined the State's point that the finding of one of those knives on Bowman's person indicated that he had lied to police when he told them that he did not carry any

weapons due to his disability. Moreover, even if counsel used the timing of Bowman's purchase of the knives to show that Bowman could not have murdered Wolfe using the particular knives admitted at trial, thus rebutting the State's point that those knives were "consistent" with Wolfe's stab wounds, that would still have done little to rebut the evidence that Bowman was the one who murdered Wolfe. This evidence included: the -7925 phone number, which exchanged calls with Wolfe's phone and tracked with its movements shortly before she was murdered, being labeled as "Roe FS Phone," a label consistent with Bowman's first name and his admission that he possessed a "food stamp" phone; testimony that in the weeks leading up to Wolfe's murder, the cell tower most frequently used by both the -7925 phone and by Bowman's phone was the same; testimony from multiple witnesses of Bowman's jealous and controlling behavior towards Wolfe; and the "R" and "O," the first two letters of Bowman's first name "Roe," written in blood on Wolfe's car windshield. For these reasons, Bowman has failed to show a "reasonable probability" that the trial outcome would have been

altered by testimony showing that the two knives were purchased after Wolfe's death. See *Moulder*, 317 Ga. at 47 (3); *Richardson-Bethea v. State*, 301 Ga. 859, 865 (2) & n.8 (804 SE2d 372) (2017) (identifying no prejudice from counsel's failure to present testimony because, among other reasons, the testimony could not rebut various aspects of the State's case).

(e) Next, Bowman argues that counsel was ineffective for failing to introduce evidence and elicit testimony about cell phone records that Bowman claims would show that he and Wolfe had a good relationship leading up to Wolfe's death, despite evidence that the two had a volatile relationship previously. First, Bowman argues that counsel should have called a "cell phone expert" and presented call records to show that he and Wolfe called and texted frequently in the week before the murder. A cell-phone-forensics expert that Bowman called at the motion-for-new-trial hearing testified that in the week leading up to Wolfe's death, Wolfe's phone called Bowman's phone several times a day for a total of 36 calls; Bowman's phone called Wolfe's phone almost every day for a total of 27 calls; and the

two phones texted several times a day with a total of 179 texts. Second, Bowman argues that counsel should have introduced cell phone records showing the contents of texts exchanged between him and Wolfe. According to Bowman, these records showed that he and Wolfe made plans together and exchanged friendly, caring, and comforting messages in the week leading up to Wolfe's death. And, Bowman contends, these records showed that Wolfe routinely texted "Good morning" to people other than Bowman, thus reducing the probative value of Wolfe texting this message to Bowman shortly before she was murdered.

We conclude that Bowman has failed to show that counsel was deficient in failing to call a "cell phone expert" to give testimony as Bowman describes above or to produce the cell phone records. At the motion-for-new-trial hearing, counsel testified that the State's expert in cell phone forensics had "admitted everything [that counsel] asked him to admit" on cross-examination and had provided at trial "all of the information" that counsel would have sought had he hired his own expert. And, Detective Demeester, the State's cell-

phone-forensics expert, testified at trial that Bowman and Wolfe's phones called over 60 times and texted close to 170 messages, rendering cumulative the expert testimony and evidence that Bowman argues counsel should have presented on the frequency of Bowman's calls and texts with Wolfe. Moreover, the cell phone records showing Bowman and Wolfe's texts are largely cumulative of other evidence that Bowman and Wolfe appeared to have a good relationship leading up to the murder, including: Detective Demeester's testimony on the number of calls and texts between the two in the week before the murder; evidence that on the morning of the murder, Wolfe sent Bowman a positive greeting ("Good morning"); and evidence that shortly after Jesse noticed Wolfe was missing, he called Bowman to ask if he had seen her. Lastly, that the cell phone records showed Wolfe texting "Good morning" to people other than Bowman, does little to offset the probative value of Wolfe texting "Good morning" to Bowman's phone eleven seconds before it texted the same message to the -7925 phone that tracked with Wolfe's phone shortly before she was murdered. It was not

objectively unreasonable for counsel to not present expert testimony or cell phone records that would have been unhelpful or cumulative of Detective Demeester's testimony and the evidence above. See *Patterson v. State*, 314 Ga. 167, 176 (2) (f) (875 SE2d 771) (2022) (no deficiency in counsel's failure to call witness whose testimony would have been cumulative); *Birdow v. State*, 305 Ga. 48, 52 (2) (823 SE2d 736) (2019) (no deficient performance when "trial counsel made a clear strategic choice not to call Dr. Burton to testify, reasoning that the same conclusions he would testify to could effectively be drawn out in the cross-examination of Dr. Reddy").[5]

3. Next, Bowman claims that the trial court abused its discretion by admitting under OCGA § 24-4-404 (b) ("Rule 404 (b)") evidence of Bowman's prior acts of violence against his ex-wife,

---

[5] Lastly, to the extent Bowman asserts a generalized claim that counsel was ineffective for failing to conduct an adequate pretrial investigation, Bowman has failed to show that counsel performed deficiently. Bowman does not offer any argument supporting such a generalized claim, and, to the contrary, counsel testified at the motion-for-new-trial hearing that, among other things, he "thoroughly inspected the discovery," read summaries of witness statements and examined cell phone records in detail, and spoke with Bowman multiple times and collected information from witnesses to prepare for trial.

Bonnie Brewer.[6] See Rule 404 (b) ("Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith," but may "be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.").

Before trial, the State filed its notice of intent to offer the prior-acts evidence for purposes of showing intent, motive, or plan. Over defense counsel's objections, which he renewed at trial, the trial court permitted the State to present the prior-acts evidence under Rule 404 (b) and instructed the jury to consider the evidence only for the purposes of showing intent, motive, or plan. Brewer then testified that she had married Bowman in 1986, gave birth to a daughter about a year later, and divorced him shortly after; that Bowman would hit her; that he had told her once to not get out of

---

[6] Bowman claims in his appellate briefing that the trial court "erred" in admitting the Rule 404 (b) evidence. But as we state below, "[o]n appeal, a trial court's decision to admit evidence pursuant to OCGA § 24-4-404 (b) is reviewed for a clear abuse of discretion." *Brannon v. State*, 298 Ga. 601, 606 (4) (783 SE2d 642) (2016).

bed because he had a gun under it; that after the two divorced, Bowman "wanted [Brewer] to come back," apologized to her and promised to not hit her again, but then "hit [her] in [her] face" and would tell her "nobody else would have [her]"; that once after the divorce, he choked a man that she was "seeing" and "took [her] kids and . . . left with them"; and that in another incident after the divorce, around 1999, Bowman arrived in violation of a restraining order at Brewer's house where her boyfriend was also staying, told her he "just want[ed] to talk to [her]," used a gun to prevent Brewer from calling 911 and to command her and her boyfriend to enter a room, and told her boyfriend that he had "better not never catch him back there again." The State also introduced a copy of Bowman's indictment and sentencing for aggravated assault stemming from this last incident.[7]

"On appeal, a trial court's decision to admit evidence pursuant to OCGA § 24-4-404 (b) is reviewed for a clear abuse of discretion."

---

[7] The defense then tendered a copy of a subsequent pardon issued for the aggravated assault offense, which the trial court admitted.

*Brannon v. State*, 298 Ga. 601, 606 (4) (783 SE2d 642) (2016). "[E]videntiary errors require reversal only if they harm a defendant's substantial rights," and the "test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Pritchett v. State*, 314 Ga. 767, 778 (2) (c) (879 SE2d 436) (2022) (citations and punctuation omitted). "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." *Jackson v. State*, 306 Ga. 69, 80 (2) (c) (829 SE2d 142) (2019) (citation and punctuation omitted).

Assuming without deciding that the trial court abused its discretion in admitting the prior-acts evidence, we conclude that any error was harmless. See *Virger v. State*, 305 Ga. 281, 293-94 (7) (a) (824 SE2d 346) (2019) (pretermitting whether testimony was admitted in violation of Rule 404 (b) and stating "we need not decide whether the evidence was properly admitted, because its admission was harmless"). To start, the marginal harm of the jury learning of

Bowman's violence and jealousy against his ex-wife from nearly two decades ago, was unlikely to have significantly altered the jury's perception of Bowman, given that the jury heard substantial other evidence, unchallenged on appeal, of Bowman's violence and jealousy against Wolfe. This evidence included testimony that: Bowman argued with Wolfe for not holding his hand; he forcefully grabbed her arm or slapped her when she did not give him the attention he wanted; Bowman hit Wolfe "right in the eye," and she had "[b]lack eyes, busted lips" and bruises on her arms and wrist while dating Bowman; Wolfe confided in a friend that Bowman had pushed her down on a bed and choked her, but she was afraid to end her relationship with him because he had told her "he could do something to her and get rid of her and . . . nobody would ever prove anything"; and, after the two terminated their engagement, Wolfe dated another man and Bowman would stalk Wolfe at stores and residential areas to the point where her son decided to confront him to stop. In light of all this testimony of Bowman's violent, controlling behavior toward Wolfe, any unfair prejudice from the erroneous

admission of evidence that Bowman behaved similarly toward another woman decades earlier was very low. Thus, because the prior-acts evidence was not probative of Bowman's guilt and was low in unfair prejudice, it was unlikely to have carried significant additional weight with the jury.[8] See *State v. Williams*, 316 Ga. 249, 254-55 (887 SE2d 285) (2023) (evidence that defendant's relationship with a woman was extramarital carried "exceedingly

---

[8] Some members of this Court would conclude that the probative value, if any, of the prior-acts evidence was substantially outweighed by its unfair prejudice, thus rendering the admission of such evidence a violation of OCGA § 24-4-403 ("Rule 403") ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"). See *Kirby v. State*, 304 Ga. 472, 479-80 (4) (819 SE2d 468) (2018) (proper admission of prior-acts evidence under Rule 404 (b) requires that such admission not violate Rule 403). But even if prior-acts evidence is admitted in violation of Rule 403, thus rendering its admission error, that does not mean that the error is per se harmful such that reversal is required. The "test for determining nonconstitutional harmless error"—an inquiry separate from Rule-403 analysis—"is whether it is highly probable that the error did not contribute to the verdict." *Pritchett*, 314 Ga. at 778 (2) (c) (citation and punctuation omitted). And here, one reason why it was highly probable that evidence of Bowman's prior acts against Brewer did not contribute to the jury's verdict even if erroneously admitted, is that the prior-acts evidence was not probative of Bowman's guilt and was low in unfair prejudice. Given all the evidence of Bowman's prior violence against Wolfe—as well as substantial evidence of Bowman's guilt, as we later explain—evidence that he had also been violent against Brewer did not add much to sway the jury to find him guilty on a basis other than the unchallenged-on-appeal evidence of his guilt. See *Williams*, 316 Ga. at 253 ("unfair prejudice" speaks to the capacity of evidence to "lure the factfinder into declaring guilt on an *improper basis rather than on proof specific to the offense charged*" (emphasis added) (citation and punctuation omitted)).

low prejudicial impact" in light of evidence of the "extramarital nature" of defendant's relationship with another woman); *Young v. State*, 309 Ga. 529, 536-38 (3) (847 SE2d 347) (2020) (concluding that assumed error in admission of photo showing defendant with a gun was harmless, in part because "any harmful effect that the [ ] photo may have had was diminished" given the other evidence "pertaining to other pictures of [the defendant] with guns"); *Rodrigues v. State*, 306 Ga. 867, 867 n.1, 870-72 (2) (834 SE2d 59) (2019) (concluding that assumed error in admitting evidence of separate stabbing incident occurring about five years before the crimes was harmless, in part because the "marginal harm" of jury learning that the defendant had been "previously convicted of involuntary manslaughter related to a stabbing [was] unlikely to have substantially impacted the jury's perception of [him], given that they were already aware that [he] was incarcerated at the time" he killed the victim in the present case").

Moreover, the evidence against Bowman, though circumstantial, was substantial. As discussed above, the jury heard

ample testimony, unchallenged on appeal, from multiple witnesses showing that Bowman used forced against Wolfe when he was jealous, as well as testimony that Wolfe started dating another man after she terminated her engagement to Bowman and that Bowman stalked her after the termination. The -7925 phone that exchanged three calls with Wolfe and pinged the same cell towers and sectors shortly before she was murdered, and whose last communication and pinged location were the same as those of Wolfe's cell phone, was saved in Wolfe's contacts as "Roe FS Phone" with "Roe" being Bowman's first name and "FS Phone" aligning with the fact that Bowman stated to officers that he had a "food stamp" phone. Also, in the weeks leading up to Wolfe's murder, the cell tower most frequently used by both the "Roe FS Phone" and by Bowman's phone was the same. The morning of the murder, Wolfe's cell phone texted the "Roe FS Phone" number "Good morning" only eleven seconds after texting "Good morning" to Bowman's phone and not receiving a reply. Law enforcement found "R" and "O," the first two letters of Bowman's first name, written in blood on Wolfe's car windshield.

And, as indicated by Bowman's carrying of a sheath knife and a gun at the time of his arrest, Bowman had lied to police about not carrying any weapons, which the jury could have determined revealed a consciousness of guilt. See *Jenkins v. State*, 313 Ga. 81, 89 (3) (868 SE2d 205) (2022) (the fact of "concealment" or "assumption of a false name . . . is admissible as evidence of consciousness of guilt for the charged offense, and thus of guilt itself" (citation and punctuation omitted)); *Michael v. State*, 335 Ga. App. 579, 585 (1) (782 SE2d 479) (2016) ("The jury . . . could reasonably infer from [defendant's] . . . initial lying to the police that [she] was conscious of her own guilt").

For all these reasons, it is "highly probable" that any assumed error in the trial court's admission of the prior-acts evidence "did not contribute to the verdict." *Pritchett*, 314 Ga. at 778 (2) (c). See *Nundra v. State*, 316 Ga. 1, 7 (2) (885 SE2d 790) (2023) (any Rule 404 (b) error in admitting evidence of prior crime committed "a long time ago" was harmless given strong evidence of defendant's guilt); *Kirby v. State*, 304 Ga. 472, 487 (4) (c) (819 SE2d 468) (2018) (error

in admitting prior-acts evidence was harmless where jury "was already aware that [Appellant] had committed other violent crimes" and where "any prejudice from the evidence that [Appellant] had committed" additional violent acts was "easily offset by the other compelling evidence against Appellant"); *Douglas v. State*, 303 Ga. 178, 182-83 (3) (811 SE2d 337) (2018) (any error in admission of Rule 404 (b) testimony was harmless where evidence of defendant's guilt was strong and where other evidence established the same facts supported by the challenged testimony).

4. Finally, to the extent Bowman claims that he is entitled to a new trial based on the cumulative prejudice resulting from the trial court's error and from his trial counsel's ineffective assistance, that claim fails. "At least as to evidentiary issues, this Court must 'consider collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel.'" *Allen v. State*, 310 Ga. 411, 417 (4) (851 SE2d 541) (2020) (citation omitted). See *State v. Lane*, 308 Ga. 10, 14 (1) (838 SE2d 808) (2020). Here, even considering the presumed trial court

error in admitting the prior-acts evidence along with the presumed deficiency in counsel's failure to present testimony regarding the two knives, we conclude that given the strength of the evidence against Bowman, Bowman "has not demonstrated a reasonable probability that, but for these" two assumed errors, "the outcome of the proceeding would have been different." *Payne v. State*, 314 Ga. 322, 334 (4) (877 SE2d 202) (2022). Thus, we conclude that the cumulative effect of the assumed errors does not entitle Bowman to a new trial. See *Jennings v. State*, 318 Ga. 579, 592-93 (4) (899 SE2d 210) (2024) (combined prejudicial effect of assumed trial court error and deficiencies by counsel did not warrant new trial where evidence against defendant was strong); *Lofton v. State*, 309 Ga. 349, 366-67 (7) (846 SE2d 57) (2020) (combined prejudicial effect of assumed trial court errors and deficiency by counsel did not deprive defendant of his right to a fair trial where properly admitted evidence of defendant's guilt was strong).

*Judgment affirmed. All the Justices concur.*