NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 28, 2025

S25A0399. JACKSON v. THE STATE.

ELLINGTON, Justice.

A DeKalb County jury found Carey Jackson guilty of felony murder, aggravated assault, first-degree criminal damage to property, and a violation of the Street Gang Terrorism and Prevention Act (the "Street Gang Act"), OCGA § 16-15-4 (a), in connection with the shooting death of Arnold Leslie and the assaults of seven other individuals.[1] Jackson contends that the trial court

---

[1] The crimes occurred on April 6, 2020. On December 1, 2020, a DeKalb County grand jury returned an indictment charging Jackson with malice murder (Count 1); felony murder (Count 2); aggravated assault (Counts 3-10); first-degree criminal damage to property (Counts 11-12); possession of a firearm during the commission of a felony (Count 13); and a violation of the Street Gang Act (Count 14), in connection with the shooting death of Leslie and the aggravated assaults of Leslie, Nasir Kareem, Marquita Kareem, Kahlil Kareem, Tahir Karim, Kayla Farrell, Janaya Gray, and Amirah Kareem. At the conclusion of a jury trial that began on December 2, 2021, the jury found Jackson not guilty of malice murder and possession of a firearm during the commission of that felony, but guilty of the remaining counts. On December 17, 2021, the trial court sentenced Jackson to life in prison with the possibility of parole for felony murder (Count 2). The aggravated assault involving Leslie

erred in denying his motion for a new trial on ineffective assistance of counsel grounds. In support of his claim of ineffective assistance, Jackson argues that the trial court's pattern jury instruction pertaining to a violation of the Street Gang Act (Count 14) contained language creating a constitutionally impermissible mandatory presumption as to an essential element of the Street Gang Act count – purportedly a violation of *Sandstrom v. Montana*, 442 U. S. 510, 521-524 (III) (99 SC 2450, 61 LE2d 39) (1979) – to which trial counsel should have objected. Counsel's failure to object was constitutionally ineffective assistance of counsel, he argues, because it allowed the jury to find Jackson guilty on Count 14 without first finding that the State had proven that at least one of the predicate acts (e.g., murder)

---

(Count 3) merged with the felony murder conviction. The court imposed consecutive 20-year prison terms for each of the remaining aggravated assaults (Counts 4-10), a concurrent 10-year prison term for each instance of first degree criminal damage to property (Counts 11-12), and a consecutive 20-year prison term for violating the Street Gang Act (Count 14). Jackson timely filed a motion for new trial on January 18, 2022, which he amended through new counsel on April 9, 2024. After a hearing, the trial court denied the motion for new trial on June 26, 2024. Jackson timely filed a notice of appeal on July 16, 2024, and the case was docketed in this Court to the term beginning in December 2024 and submitted for a decision on the briefs.

2

was intended to further the interests of the gang.[2] Because Jackson has not shown that trial counsel was constitutionally ineffective for failing to make what is a meritless argument, as explained below, we affirm.

1. *Evidence presented at trial.* The evidence presented at trial shows that Jackson was a member of a branch of the California-based Bloods gang known locally as the Taliban Fruit Town Brim Bloods, or "Brim" for short. On the night of the shooting, Jackson lost a fistfight to Nasir Kareem. Jackson and Kareem had been feuding over a woman. Jackson's loss to Kareem injured his standing in the gang as well as the gang's reputation. So, Jackson and an associate later went to Kareem's home armed for revenge. The two men fired over 30 rounds into the home, injuring Kareem, terrorizing the people in the home, and killing Kareem's older

---

[2] OCGA § 16-15-4 (a) provides that "[i]t shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3." This Court has held that, based on the statute's use of the preposition "through," an essential element of the offense is a "nexus between the act and an intent to further street gang activity." *Rodriguez v. State*, 284 Ga. 803, 807 (1) (671 SE2d 497) (2009) (punctuation omitted).

brother, Leslie.

Witnesses testified that Jackson and Kareem had both dated the same woman, Kalyx Judkins. Kareem and Judkins had ended their relationship on angry terms; Judkins had antagonized Kareem and Kareem believed Judkins had cheated on him with Jackson. After Judkins and Kareem broke up, Judkins immediately began a romantic relationship with Jackson. Kareem testified that, on April 6, 2020, Jackson repeatedly called him and accused him of telling lies about him. After the calls, Jackson, Judkins, and their friend, Mya Garrison, drove to Kareem's DeKalb County home in Judkin's black Ford Taurus to confront Kareem. When Jackson arrived, Kareem went outside with several members of his family, including his stepmother and Leslie. Kareem told Jackson to get away from his home because there were children inside. He said, if "y'all want to fight, we can go down the street a little bit." Jackson taunted Kareem and a fist fight erupted between them "instantaneously." During the fight, Kareem pulled off Jackson's hoodie and felt the weight of a handgun in it. Although Kareem appeared to be winning

4

the fight, Leslie broke it up. Leslie shouted to Kareem: "This man got a gun." He told Kareem to go inside the house, and Kareem complied. After a heated argument with Kareem's stepmother, Jackson, Judkins, and Garrison returned to their car. Kareem's stepmother testified that before they left, Jackson yelled: "On Brim, this is not done!" Garrison testified that Jackson was angry, armed, and wanted to finish the fight. Jackson sped away from Kareem's house, driving recklessly through the neighborhood at what "felt like 100 miles per hour." Jackson drove to his apartment and the group went inside. Jackson immediately collected a second firearm from his bedroom closet, and then he left, alone, in Judkins's car. Garrison and Judkins called Judkins's mother, who gave them a ride to Judkins's home.

About an hour after the fight, as Leslie, Kareem, and Kareem's sister stood in the carport of their home, discussing the events that led to the fistfight, Jackson returned in the black Ford Taurus they had seen earlier. They watched the car pass by the house, turn around, and then stop beneath a streetlight. Kareem testified that

Jackson and an unidentified man with his face concealed by the hood of his jacket got out of the car. Then, without warning, the two men opened fire at Kareem's house. They fired at least 30 rounds into the home. Kareem was shot twice but survived. Leslie was fatally shot in the chest. Jackson and the man with him continued firing into the home until Kareem's father, Khalil, drove up. Khalil turned on his car's high beams and drove directly at the shooters, who got in the car and fled. As the shooters sped away, Khalil pursued them while also calling 911. The unidentified passenger shot at Khalil as Khalil chased the shooters through downtown Stone Mountain. An innocent bystander, Jeanell Harris, was driving home when she heard gunfire and saw two cars speed by her. She later found what appeared to be a bullet hole in the hood of her car.

After Jackson eluded Khalil, he went to Judkins's home. Garrison testified that, when Jackson returned, he was with three men. After the men helped Jackson clean his guns, they left. Garrison observed that Jackson changed his clothes completely. Jackson remained at Judkins's home until the following day, when

6

he surrendered himself to a DeKalb County SWAT team that had begun setting up a perimeter around his apartment complex. Upon learning that Jackson was suspected of being a member of a gang, a deputy with the DeKalb County Sheriff's Office spoke with Jackson at the jail. The purpose of the conversation was to determine if Jackson had any gang affiliation so that he was not placed with inmates who were rival gang members. Jackson told the deputy that he was "a member of the Taliban Fruit Town Brim Bloods" and had the rank of "baby gangster or BG."

A detective with the DeKalb County Gang Unit testified that he was familiar with Taliban Fruit Town Brim Bloods and how the gang operated. The detective said the gang had engaged in a number of crimes in DeKalb County, including homicides, aggravated assaults, and drive-by shootings. He explained that the gang engaged in criminal activity because "they don't want to be messed with;" indeed, they want their members to remain "in good standing" so that the gang is feared and respected. For a gang and its members, the detective said, "respect is everything." "Without the

7

respect, you don't have the power." According to the detective, a gang member who has a reputation for being disrespected loses standing in the gang and is considered "weak." Thus, when a gang member suffers an injury to his reputation "and respect is lost, retaliation is a must." The detective also testified that, based on several phone calls that Jackson made immediately after his fight with Kareem to phone numbers belonging to known gang members, it appeared that Jackson had sought "the green light" from "his big homies" – his superiors in the gang – to commit the shooting.

2. *Jackson's claim of ineffective assistance of counsel.* Jackson argues that his trial counsel was constitutionally ineffective because he failed to object to a pattern jury instruction defining the offense of participating in criminal street gang activity in violation of the Street Gang Act that purportedly contained language creating a constitutionally impermissible mandatory presumption. As explained below, this argument is without merit.

To establish his claim of ineffective assistance of counsel, Jackson is required to prove both that his counsel's performance was

8

deficient and that the deficient performance prejudiced him. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). "To prove deficient performance, [a defendant] must show that [his] counsel performed in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms," *Ward v. State*, 313 Ga. 265, 273 (4) (869 SE2d 470) (2022) (citation and punctuation omitted), which requires the defendant to overcome the "'strong presumption' that trial counsel's performance was adequate." *Perkins v. State*, 313 Ga. 885, 901 (5) (873 SE2d 185) (2022), citing *Strickland*, 466 U. S. at 689 (III) (A). "To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." Id. (citing *Strickland*, 466 U. S. at 694 (III) (B)). If Jackson fails to make a sufficient showing on one part of the *Strickland* test, we need not address the other. See *Bowman v. State*, 319 Ga. 573, 576-577 (2) (905 SE2d 605) (2024).

With regard to the Street Gang Act violation, the State was

9

required to establish:

> (1) the existence of a "criminal street gang," defined in OCGA § 16-15-3 (3) as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity"; (2) the defendant's association with the gang; (3) that the defendant committed any of several enumerated criminal offenses, including those "involving violence, possession of a weapon, or use of a weapon"; and (4) that the crime was intended to further the interests of the gang.

*Poole v. State*, 312 Ga. 515, 520 (1) (863 SE2d 93) (2021) (citation and punctuation omitted). As to the fourth element, which is the focus of Jackson's argument, "there must be some nexus between the act and an intent to further street gang activity." *Rodriguez v. State*, 284 Ga. 803, 807 (1) (671 SE2d 497) (2009) (punctuation omitted). The trial transcript shows that the judge instructed the jury that the State had to prove four elements in support of Count 14, a violation of the Street Gang Act.[3]

Jackson challenges the trial court's instruction with respect to

---

[3] The trial court gave the pattern jury instruction in full. See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.02.25 (4th ed., updated Jan. 2017).

language in the pattern charge describing the required nexus: "[T]he State must prove that there is a nexus between the crime committed and the gang, that the crime was committed to further the interests of the gang; *meaning proof that the crime committed was the sort of crime that the gang does*." Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.02.25 (4th ed., updated Jan. 2017) (emphasis supplied). Jackson frames his argument thus: The pattern instruction was erroneous as it permitted the jury to find a violation of the Street Gang Act based on "alternative evidence," that is, proof that the predicate crime was merely "the sort of crime that the gang does" instead of one "committed to further the interests of the gang." A jury instruction permitting such an "alternative evidentiary finding," he contends, constitutes an unconstitutional "mandatory presumption" in violation of *Sandstrom*. This language, however, does not permit an "alternative evidentiary finding," nor does it create a mandatory presumption.

A mandatory presumption is one which tells the trier of fact that "they must find the ultimate fact upon proof of the basic fact."

11

*Williamson v. State*, 248 Ga. 47, 54 (1) (c) (281 SE2d 512) (1981)

(citation, punctuation, and emphasis omitted). A permissive

presumption or inference, on the other hand, is one which "allows –

but does not require – the trier of fact to infer the ultimate fact from

proof by the prosecutor of the basic fact." Id. (citation and

punctuation omitted). As a matter of constitutional due process,

statutory presumptions cannot be conclusive on the factfinder or

shift the burden of proof to the defendant in criminal cases. See

*Sandstrom*, 442 U. S. 510; *Francis v. Franklin*, 471 U. S. 307, 313

(II) (105 SC 1965, 85 LE2d 344) (1985); *Napier v. State*, 276 Ga. 769,

771 (2) (583 SE2d 825) (2003), disapproved on other grounds,

*Shelton v. Lee*, 299 Ga. 350, 355-356 (2) (b) (788 SE2d 369) (2016).

In determining whether the challenged portion of the pattern charge

violates Jackson's due process rights, we must determine the nature

of the presumption it describes, if any, and whether it impermissibly

shifts the burden of proof to the defendant. "Significant to this

determination is the way in which a rational trier of fact might have

perceived the instruction." *Williamson*, 248 Ga. at 58 (2).

Jackson's argument fails because the challenged language does not create a mandatory presumption, nor does it shift the burden of proof to the defendant. The jury would not have perceived the instruction as requiring it to find Jackson guilty of violating the Street Gang Act simply because other members of his gang had committed aggravated assaults in the past. Rather, the instruction, read as a whole, informed the jury about the "meaning" of the phrase "further the interests of the gang." A crime that furthers the interests of the gang is not just any crime committed by a gang member; rather, it is "the sort of crime that the *gang* does." (Emphasis supplied.) In other words, the instruction informed the jury that a crime that furthers the interests of the gang is the sort of crime that the gang, as an organization, engages in, not simply a crime that a member of the gang may have committed in the past.

Further, this instruction did not relieve the jury of its obligation to find beyond a reasonable doubt the requisite nexus between the predicate crime and the gang. Rather, the charge explained to the jury that it may infer from the gang's involvement

in certain sorts of crimes that the gang engages in those crimes to further its interests. However, the jury still had to find, based on the evidence presented, that the State had proven beyond a reasonable doubt that the crime Jackson committed was the sort of crime that the gang committed, that is, a crime that furthers the interests of the gang. Thus, the pattern charge did not relieve the jury of its factfinding duty by directing it to presume the existence of a nexus between the predicate crime and the gang. See *Williamson*, 248 Ga. at 54 (1) (c). Nor did it shift the burden of proof to the defendant to disprove the existence of the nexus element in violation of his due process rights. See *Sandstrom,* 442 U. S. 510. Consequently, Jackson has not shown that the pattern jury instruction is one to which his trial counsel should have objected.

Because Jackson has not shown that trial counsel should have objected to the charge, he has not demonstrated that counsel's performance was deficient in this regard. Having failed to satisfy the deficiency portion of his claim of ineffective assistance of trial counsel, he has not carried his burden of demonstrating that his trial

14

counsel was constitutionally ineffective. See *Bowman v. State*, 319 Ga. at 576-577 (2); *Faust v. State*, 302 Ga. 211, 218-219 (4) (b) (805 SE2d 826) (2017) (The failure to make a meritless objection cannot support a claim of ineffective assistance.).

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, McMillian, LaGrua, Colvin, and Pinson, JJ, concur.*