NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: April 8, 2025

S25A0249.  THE STATE v. CLEVELAND.
S25A0250.  THE STATE v. WILLIAMS.

MCMILLIAN, Justice.

After Jalontaye Clay Cleveland and Courtney Trumaine Williams were jointly convicted of malice murder for the shooting death of Vatsal Patel and crimes involving several other victims, the trial court granted a new trial because the court had instructed the jury that three of the State's witnesses were accomplices to Cleveland and Williams in violation of OCGA § 17-8-57 (a) (1), which prohibits a court from commenting on the guilt of the accused.[1] On

---

[1] The crimes occurred between October 10, 2016, and January 18, 2017. Vatsal died on November 6, 2016. On March 26, 2019, a Muscogee County grand jury indicted Cleveland, Williams, Dominique Collins, Joshua Tucker, and Kimberly Huffman for various crimes. Both Cleveland and Williams were charged with malice murder (Count 1), felony murder (Count 2), two counts of aggravated assault (Counts 3 and 7), criminal attempt to commit a felony (Count 4), five counts of armed robbery (Counts 5-6 and 9-11), and kidnapping (Count 8). Williams was additionally charged with making terroristic threats (Count 12). Prior to trial, Collins, Tucker, and Huffman pleaded guilty to their

appeal, the State argues that the trial court improperly granted a new trial because the jury charges, considered as a whole, remedied the error of the faulty accomplice charge. For the following reasons,

respective charges upon the condition that they testify against Cleveland and Williams.

At a trial from May 20 through June 6, 2019, a jury found Cleveland guilty of all counts, except for Count 11. On June 6, 2019, the trial court sentenced Cleveland to serve life in prison without the possibility of parole for Count 1, a concurrent 20-year sentence for Count 3, a concurrent 10-year sentence for Count 4, a concurrent 20-year sentence for Count 5, a concurrent 20-year sentence for Count 6, a concurrent 20-year sentence for Count 7, a concurrent sentence of life in prison without parole for Count 8, a concurrent 20-year sentence for Count 9, and a concurrent 20-year sentence for Count 10. The trial court purportedly merged Count 2 with Count 1 for sentencing purposes, although that count was actually vacated by operation of law. See *Favors v. State*, 296 Ga. 842, 847-48 (5) (770 SE2d 855) (2015).

During the same trial, a jury found Williams guilty of all counts, except for Counts 5 and 12. On June 6, 2019, the trial court sentenced Williams to serve life in prison without the possibility of parole for Count 1, a concurrent 20-year sentence for Count 3, a concurrent 10-year sentence for Count 4, a concurrent 20-year sentence for Count 6, a concurrent 20-year sentence for Count 7, a concurrent sentence of life in prison without parole for Count 8, a concurrent 20-year sentence for Count 9, a concurrent 20-year sentence for Count 10, and a concurrent 20-year sentence for Count 11. The trial court purportedly merged Count 2 with Count 1 for sentencing purposes, although that count was actually vacated by operation of law. See *Favors*, 296 Ga. at 847-48 (5).

Cleveland filed motions for new trial on June 18 and June 20, 2019, which he amended on November 20, 2020. Williams filed a motion for new trial on July 3, 2019, which he amended on November 20, 2020, and January 28, 2021. After hearings on December 2, 2020, and December 8, 2022, the trial court granted both defendants' motions for new trial, as amended, on July 29, 2024. The State filed a notice of appeal on August 22, 2024. The cases were docketed to the term of this Court beginning in December 2024 and submitted for a decision on the briefs.

we affirm.

1. The evidence presented at trial shows that six armed robberies were committed at various gas stations in Columbus, Georgia between October 10, 2016, and January 18, 2017.

(a)   *UR Choice Food Mart*

On October 10, 2016, Jashodaban Patel was working at the UR Choice Food Mart. She testified that a man entered the store around 11:00 a.m., wearing all black and a mask over his face. He reached into his hoodie and pulled out a "small two toned," silver handgun. Once behind the register area, he "shoved a gun at [Patel's] head" and demanded money. He took cash from the register, cash from a separate black box where "additional money over a certain amount" was stored, and Newport cigarettes. Collins testified that Cleveland told him that he and Williams had committed a robbery "on Warm Springs Road," which is where the UR Choice Food Mart was located, and that "a lady [was] in there . . . by herself."[2]

(b)   *Weems Road Food Mart*

---

[2] Jashobadan Patel mentioned only one robber in her testimony.

3

On October 15, 2016, Ankit Mistry was working at the Weems Road Food Mart. He testified that two men entered the store. One of them fired a shot, and Mistry "moved down and tried to reach up" under the counter to get his H&K .40-caliber gun. The men then came around the counter and started shooting again, firing three more shots, one of which hit Mistry in the leg. They reached over Mistry and grabbed his gun before he got to it. During the robbery, Mistry heard one man refer to the other as "Jay."[3] They left with the store's cash register and credit card reader, Mistry's wallet, and the H&K .40 caliber gun. Collins testified that Cleveland also told him about a robbery "where the store clerk was shot" and that Cleveland was the one who shot him.

(c)   *M&P Food Mart*

Collins testified that, on October 22, 2016, Williams was driving Cleveland and Collins around, and they "talk[ed] about

---

[3] Collins testified that Cleveland went by the nickname "Jay" or "LoSo."

4

doing a robbery."[4] Ritesh Prajapati[5] was working at the M&P Food Mart that day. According to Collins, Williams dropped them off at the store "after 9:00 [p.m.]" Since the store was already closed, Cleveland and Collins waited outside for Prajapati to come out, but "his taxicab [was] waiting outside." Williams then followed Prajapati to his home, where Cleveland got out of the vehicle with a .40-caliber pistol.[6] Collins went to assist Cleveland, and they put Prajapati into a "large . . . dark colored" vehicle, "in the back seat between two subjects" with a bag over his head. Prajapati provided the keys and security code for the store.

Collins testified that he went back into the store and took money from the cash register and some cigarettes. When Collins called Williams to pick him up, Cleveland and Prajapati were no longer in the vehicle. Williams then drove Collins to a "dead end . . .

---

[4] Collins's testimony provided most of the details surrounding the M&P Food Mart robbery, and this testimony was corroborated by the surveillance video from the store.

[5] Prajapati did not testify at trial. According to the State, he "left the store" following the robbery and "couldn't be found."

[6] Collins testified that the gun Cleveland used during the M&P Food Mart robbery was "from the store clerk that he shot in the previous robbery."

grabbed his gun and he got out [of] the car and . . . went off in between the trees somewhere." When Williams came back, Cleveland and Prajapati were with him. Prajapati had been beaten with a pistol and stripped to his underwear. Williams asked Prajapati "where the big cache of money was [] in the store, and he told him to . . . go in the store and get it." Cleveland, Collins, and Prajapati then went into the store a second time. Prajapati brought them to a room where "[a]round $5,000" was in a "black bank little zipper deposit bag"; they took the money and left the store. Prajapati described the perpetrators to police as "[f]our . . . males with bandannas [over their faces]" in a "black SUV."

    (d)    *5 Corner Lotto*

Collins testified that, on November 5, 2016, around 9:30 p.m., he went into the 5 Corner Lotto and bought a Gatorade using an EBT card that Williams gave him.

Collins and Tucker further testified that, the following day, Williams drove them and Cleveland "around for a couple of hours"

6

in a GMC Denali XL.[7] They went to the 5 Corner Lotto between 8:00 and 9:00 p.m. Collins said that he got out of the vehicle, went inside, and tried to buy a cigar, but he did not have his ID with him. They left the area but planned to rob the store later that night.

Guatamkumar Patel[8] and his son, Vatsal Patel, were working at the 5 Corner Lotto that night. Because Collins had seen that there was "glass up between the counter and behind the cash register area," Cleveland, Collins, and Tucker planned to "wait somewhere out of sight" until the Patels were leaving. They waited around the back of the building with masks covering their faces; Collins was on the phone with Williams, who remained in the vehicle. Collins testified that Cleveland carried a .380-caliber Taurus and that Tucker had a .40-caliber firearm from "[a] previous robbery."[9] When

---

[7] Officers were able to determine the make and model of the vehicle after viewing the surveillance footage from the 5 Corner Lotto. The footage showed the same vehicle – a "dark colored SUV, . . . on the larger side" – the day before the shooting, several hours before the shooting, and again around the time of the shooting, "circling the area, going around the surrounding streets and passing by the 5 Corner Lotto store."

[8] Guatamkumar Patel did not testify at trial. His daughter-in-law testified that he left the country after the shooting.

[9] Tucker admitted that he was carrying a weapon when he got out of the vehicle, but he testified that he did not know what kind it was.

Williams signaled that the Patels were leaving the store, Cleveland, Collins, and Tucker proceeded to the front of the building. Collins and Tucker testified that, as they approached, Cleveland – wearing a "splatter jacket"[10] – fired his weapon, hitting Guatamkumar Patel in the torso. Cleveland then fired several more times, and one of the shots hit Vatsal Patel in the upper back, killing him almost instantly. They ran, and Williams picked them up one street over. Officers recovered six .380-caliber TulAmmo brand shell casings and several bullets from the scene.

(e)  *ABC Food Mart*

On January 13, 2017, Kulwinder Singh was working at the ABC Food Mart. He testified that, around 9:00 p.m., two men entered the store, both wearing masks over their faces. They were armed with handguns. One jumped over the counter, and the other came around it, placing a weapon on the counter and pointing it at Singh. He said that they took "all [his] money." After reviewing the

---

[10] Investigators described this jacket as a "unique," "camouflage jacket," and Tucker testified that it was "black and white."

surveillance footage from the store, an officer testified that the gun one of them carried was "not a pistol that [he had] commonly seen," with "an extremely long barrel[,] a rectangular body and more of a rounded barrel," and "no front sight on the gun, which is not common."

(f)    *UR Choice Food Mart*

On January 18, 2017, Rajubhai Patel – Jashobadan Patel's husband – was working at the UR Choice Food Mart.[11] He told detectives on the scene that two men came into the store with "bandanas over their face[s], heads covered," and each carrying a black firearm. He testified that one of them stayed by the door while the other approached the counter and "put [a] gun [to Patel's] head." The man at the counter told Patel to give him money; he handed over cash from the register as well as the "box money."[12] The men took the money and left the store. From the surveillance footage, a

---

[11] This is the same UR Choice Food Mart that was robbed on October 10, 2016.

[12] The "box money" was in a black box behind the counter, which was the same box that the robbers located and took from in the first UR Choice Food Mart robbery.

detective testified that one of the weapons used was "a pistol, but it had a really long barrel on it."

(g) *Investigation and Arrests*

Detectives determined that the GMC Denali XL that had been seen several times in the footage from the 5 Corner Lotto incident was owned by Williams's girlfriend, Kimberly Huffman. On November 21, 2016, detectives searched Huffman's vehicle and located an ID card, a pill bottle prescribed to Williams, and a phone linked to Williams. Huffman admitted that Williams took her vehicle on November 6, 2016, returning it later that night. And Williams subsequently asked Huffman to put silver trim on the car.

The EBT card that Collins used at the 5 Corner Lotto was also traced to Huffman. Huffman later admitted that Williams knew the PIN number to her EBT card, and Collins testified that Williams had given this number to him.

Cell records from the area around the 5 Corner Lotto showed a

call that was placed from a phone linked to "Trumaine Flowers"[13] at the time of the shooting. Using cell records from the receiving number, officers located Collins's girlfriend, who identified Collins from the surveillance photo of him purchasing a Gatorade inside the 5 Corner Lotto.

Collins was arrested in Kentucky on February 6, 2017, and admitted that he was the person in the photo. He also provided the names of Cleveland, Williams, and Tucker as the others involved in the 5 Corner Lotto shooting. Collins recounted that Williams was driving Huffman's vehicle, that a .380-caliber and a .40-caliber pistol were used, and that Cleveland was the shooter. He said that Cleveland was wearing Tucker's jacket, which had a distinctive pattern on it. Detectives also asked Collins to watch the surveillance footage from the ABC Food Mart robbery. He identified Cleveland and Williams by the "clothing of the individuals and the [gait] . . . the way they move, their body language, the way they walk."

---

[13] Huffman testified that "Trumaine" is Williams's middle name and that "Flowers" is Williams's father's name.

Cleveland was arrested the next day, and detectives found a .22-caliber long-barreled pistol – resembling the one seen in the footage of both January 2017 robberies – in Cleveland's bed. Cleveland admitted to being involved in the 5 Corner Lotto incident, though he claimed that he never got out of the car.

Officers then went to Tucker's home and found the "splatter jacket," and Tucker was charged in relation to the 5 Corner Lotto incident.[14] Tucker admitted that he was present during the 5 Corner Lotto robbery and that it was his jacket in the footage, but he said that Cleveland was the person wearing it. Tucker also stated that Williams had given him a weapon to carry, though he never fired it.

Williams and Huffman were arrested in March 2017. Officers found a .40-caliber H&K gun in their home, with a serial number that matched the one stolen from Mistry at the Weems Road Food Mart. Huffman's cell records also showed that, on November 6, 2016, around 11:00 p.m., she began searching for news articles related to the 5 Corner Lotto murder. Huffman stated that she made these

---

[14] Tucker was already in jail on a separate charge.

searches because Williams asked her to.

Ballistics evidence obtained from the Weems Road Food Mart and the 5 Corner Lotto showed that the bullets were fired from the same Taurus .380-caliber pistol.

(h) *Trial, Charge Conference, and Motions for New Trial*

At trial, Collins, Tucker, and Huffman testified against Cleveland and Williams. Collins testified about his participation in the 5 Corner Lotto and M&P Food Mart crimes (Counts 1-4 and 8-9). Tucker and Huffman testified about their participation in the 5 Corner Lotto crimes only (Counts 1-4).

During the charge conference, the defendants requested that the court charge the jury on accomplice corroboration. Relevant here, the court and the parties agreed upon giving the suggested pattern jury charges in 1.31.90 (Single Witness; Corroboration) and 1.31.92 (Accomplice; Corroboration).

The court and counsel then engaged in a long discussion at the charge conference about how to minimize confusion for the jury about who were allegedly accomplices to which incidents. The court

suggested that the witnesses who testified as accomplices – Collins, Tucker, and Huffman – be identified in the accomplice charges regarding their respective counts. Counsel for Cleveland agreed to list the accomplices in the jury charge. The State also agreed to naming the accomplices. But counsel for Williams argued that the jury should determine who were the accomplices.

Ultimately, the court ruled: "This is the way we're going to do it, even – if it's error, then it's my error. It's going to be an exception to the rule. We're going to specify the charges. We're going to specify the three people that testified as accomplices . . . ."

The trial court thus charged the jury, in relevant part, as follows:

> The testimony of a single witness, if believed, is sufficient to establish a fact. Generally, there is no legal requirement of corroboration of a witness, provided you find the evidence to be sufficient.
> There is an exception to this rule made in the case of Dominique Collins as to Counts 1 through 4 and Counts 8 and 9, as specified in the indictment, *where the witness is an accomplice*.
> Another exception to this rule is made in the case of Joshua Tucker as to Counts 1 through 9, as specified in the indictment, *where the witness is an accomplice*.

Another exception to this rule is made in the case of Kimberly Huffman as to Counts 1 through 4 and Count 13, as specified in the indictment, *where the witness is an accomplice.*

. . .

*And it's in reference to, once again, the counts that the three accomplices testified to and the sections in the indictment that relate[] to that person.*

(emphasis added). None of the parties objected to the jury charges as given.

In defendants' motions for new trial, they alleged, among other things, that the court committed plain error (1) by naming Collins, Tucker, and Huffman as accomplices in the jury charge and (2) in failing to fully charge the jury on the issue of accomplice corroboration by omitting three sentences in its jury instruction.[15]

The trial court conducted multiple hearings on the defendants'

---

[15] The court did not include the following in its instructions: the last sentence from Pattern Jury Instruction § 1.31.92 – "Whether or not any witness in this case was an accomplice is a question for you to determine from the evidence in this case." – and the language from Pattern Jury Instruction § 1.31.93 (A) – "The testimony of one accomplice may be supported by the testimony of another accomplice. Whether or not the testimony of one accomplice does, in fact, support the testimony of another accomplice is a matter for you to determine." Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases.

15

motions for a new trial. During these hearings, the State conceded that under Georgia case law it was an error to name certain co-indictees as accomplices to specific counts in its jury instructions and to omit the three sentences in its charge. But the State argued that the error was harmless and did not affect the outcome of the trial. The trial court granted the motions for new trial,[16] and the State appealed from that order. See OCGA § 5-7-1 (a) (8).

2. The State maintains that the trial court erroneously granted a new trial because the jury charges, considered as a whole, remedied the error of the faulty accomplice charge, as (1) the trial

---

[16] In granting the new trial, the trial court cited *Millwood v. State*, 102 Ga. App. 180 (115 SE2d 829) (1960) (granting new trial under predecessor to OCGA § 17-8-57 when the trial court's instruction was "also subject to the interpretation that the court instructed that these witnesses, who admitted their guilt, were accomplices of the defendant, which amounts to an expression of opinion that the defendant is guilty"); *Mitchell v. State*, 89 Ga. App. 80 (78 SE2d 563) (1953) (holding that trial court erred in charging that certain witnesses were accomplices "and a reversal for such error is mandatory" under the predecessor to OCGA § 17-8-57); *Demonia v. State*, 69 Ga. App. 862 (27 SE2d 101) (1943) (granting new trial under predecessor to OCGA § 17-8-57 because the court charged the jury that a witness "was an accomplice of the defendant"); and *Kryder v. State*, 57 Ga. App. 200 (194 SE 890) (1938) (holding that instruction that the witness "has filed a plea to this crime, and he being an accomplice in the case or a partner with the defendant . . . was erroneous as an expression or intimation of an opinion by the trial judge as to what had been proved, and such error requires the grant of a new trial"; citing predecessor to OCGA § 17-8-57).

court correctly instructed that it was the jury's sole right to determine guilt or innocence and (2) the trial court expressly disclaimed that any ruling or comments made by the court bore upon the parties' guilt or innocence. We disagree.

OCGA § 17-8-57 provides:

(a) (1) It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused.

. . .

(c) Should any judge express an opinion as to the guilt of the accused, the Supreme Court or Court of Appeals or the trial court in a motion for a new trial shall grant a new trial.

We have explained:

When we review alleged violations of OCGA § 17-8-57, our standard of review depends on the type of violation. If the trial court expresses an opinion as to the ultimate guilt of the accused, it is reversible error, and the defendant is entitled to a new trial. See OCGA § 17-8-57 (c). But if the trial court merely expresses an opinion as to whether a fact at issue has been proven, then the complaining party must make a timely objection. See OCGA § 17-8-57 (a) (2) and (b). Absent a timely objection . . . we review only for plain error. OCGA § 17-8-57 (b).

*Moore v. State*, 315 Ga. 263, 272 (4) (882 SE2d 227) (2022). Thus, the

17

first step in analyzing whether the trial court violated OCGA § 17-8-57 is determining whether the trial court expressed an opinion about a fact at issue or on the guilt of the accused.

Cleveland and Williams contend that by instructing the jury that Collins, Tucker, and Huffman were accomplices to certain counts, the trial court was expressing an opinion as to the guilt of the accused under OCGA § 17-8-57. They are correct. As we have explained:

> [t]o be accomplices of each other, both the defendant and the State's witness must have been involved in the criminal enterprise. One cannot be the "accomplice" of an innocent man. It therefore constitutes an expression of opinion by the court as to the guilt of the accused to instruct the jury that a witness who testified as to the defendant's guilt and admitted his participation in the crime would be an accomplice of the accused.

*Ladson v. State*, 248 Ga. 470, 477-78 (11) (285 SE2d 508) (1981) (quoting *Millwood v. State*, 102 Ga. App. 180, 180 (115 SE2d 829) (1960)). In *Ladson*, we held that the trial court properly refused to charge the jury that the witness was an accomplice, reasoning that such a charge "would have been tantamount to a charge that the defendant, as a matter of law, was a participant in the crime." Id. at

18

477 (11). Similarly, we have more recently explained that an instruction that "a particular witness was an accomplice as a matter of law . . . could be deemed the intimation of the court's opinion as to the defendant's guilt in violation of OCGA § 17-8-57." *Johnson v. State*, 288 Ga. 803, 807 (3) (708 SE2d 331) (2011). See generally *Hamm v. State*, 294 Ga. 791, 794 (2) (756 SE2d 507) (2014) ("Whether [the witness] was an accomplice, and the weight to be afforded her testimony if she was" is a question that must be submitted for the jury's determination).

Here, the trial court charged the jury that an exception to the rule that a single witness is sufficient to establish a fact is when a witness is an accomplice and specifically named Collins, Tucker, and Huffman as accomplices to certain of the counts. This instruction commented on Cleveland and Williams's guilt because an accomplice is a party to the crime and stating that these witnesses were accomplices with respect to those counts, which named Cleveland and Williams as defendants, essentially instructed the jury that Cleveland and Williams were also parties to the crime. See

19

*Johnson*, 288 Ga. at 807 (3); *Ladson*, 248 Ga. at 477-78 (11).

When a trial court comments on the guilt of the accused, reversal is required under OCGA § 17-8-57 (c). See *Moore*, 315 Ga. at 272 (4) ("If the trial court expresses an opinion as to the ultimate guilt of the accused, it is reversible error, and the defendant is entitled to a new trial."); *Harris v. State*, 302 Ga. 832, 834 (2) n.2 (809 SE2d 723) (2018) ("Under the amended version of the statute . . . , a failure to object allows review only for plain error (unless the trial judge expresses an opinion 'as to the guilt of the accused,' in which case reversal is still automatic)."); *Willis v. State*, 304 Ga. 122, 126 (2) n.5 (816 SE2d 656) (2018) ("The amended statute still requires a new trial to be granted if a judge expresses an opinion as to the guilt of the accused. OCGA § 17-8-57 (c)."); *Pyatt v. State*, 298 Ga. 742, 747 (3) n.9 (784 SE2d 759) (2016) (a trial court's comment on the guilt of the accused "amounts to reversible error" under OCGA § 17-8-57 (c)).

The State argues that the other instructions given by the trial court – that the court does not intend to express an opinion on the

case and that the jury determines ultimate issues – mitigate the harm from naming the accomplices. It is unclear whether the State is arguing that Cleveland and Williams have not met their burden of showing under the plain error standard that there is a reasonable probability that the outcome of the trial would have been different or that the error was harmless under the standard for nonconstitutional harmless error. See *Bowman v. State*, 319 Ga. 573, 584 (3) (905 SE2d 605) (2024) ("[T]he test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict."). But the plain error standard does not apply here under OCGA § 17-8-57 (c) and our precedent, which say that even in the absence of an objection at trial, reversal is automatic if the trial court comments on the guilt of the accused. Likewise, the State points to no authority applying the nonconstitutional harmless error standard to an error of this type under OCGA § 17-8-57 (c) where the statute plainly requires

21

reversal.[17] Although the trial court incorrectly applied plain error review in assessing its jury instructions, the court relied on the proper cases and ultimately reached the correct result in determining that a new trial is required in these circumstances. See *Burns v. State*, 313 Ga. 368, 372 (3) (870 SE2d 360) (2022) (disagreeing with the trial court's reasoning but affirming the judgment "because the trial court reached the right result"); *State v. Mondor*, 306 Ga. 338, 345 (2) (830 SE2d 206) (2019) (affirming trial court's exclusion of evidence under right for any reason rule).

Because we determine based on the facts recited above that the evidence is sufficient as a matter of constitutional due process, Cleveland and Williams may be retried on all counts, except Cleveland may not be retried on Count 11, and Williams may not be retried on Counts 5 and 12 as they were acquitted of those charges.

---

[17] We recognize that in *Sims v. State*, 266 Ga. 417 (467 SE2d 574) (1996), we held that the trial court's comments on the guilt of the accused were harmless because the trial court subsequently corrected the error *in the course of the trial* and provided a curative instruction to the jury on the particular point. See *Sims*, 266 Ga. at 418-19 (2). But *Sims* does not apply here because the trial court did not recognize or correct the error in naming the accomplices during the course of the trial.

See *Green v. United States*, 355 U.S. 184, 188 (78 SCt 221, 2 LE2d 199) (1957) ("[I]t has long been settled under the Fifth Amendment that a verdict of acquittal is final, ending a defendant's jeopardy, and . . . is a bar to a subsequent prosecution for the same offen[s]e." (citation and punctuation omitted)).

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, Ellington, LaGrua, Colvin, and Pinson, JJ, concur.*